Revised May 13, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-50412
_____


GEORGE R. THOMAS,

                              Plaintiff - Appellant-Cross-Appellee,

                        versus

BARTON LODGE II, LTD.,

                                   Defendant - Third Party Plaintiff-
                                        Counter Defendant-Appellee,

                              versus

PHAM BARTON LODGE II, LIMITED PARTNERSHIP, Et Al,

                                        Third Party Defendants,

RON BENEKE, Et Al,

                                   Third Party Defendants-Cross
                                                      Defendants,

                        versus

RON BENEKE; PHAM-BARTON LODGE II LIMITED
PARTNERSHIP; THE PAUL D. HINCH FAMILY
PARTNERSHIP, LIMITED; THE DISCOP COMPANY,
INCORPORATED; ALLIANCE/PCA APARTMENT PORTFOLIO
I LIMITED PARTNERSHIP; ALLIANCE/PCA COMPANY;
HBC PARTNERS LIMITED PARTNERSHIP; HINCH PARTNERS,

                        Third Party Defendants - Cross Defendants-
                                                        Appellees,

GENERAL ELECTRIC CAPITAL CORPORATION; GENERAL
ELECTRIC REAL ESTATE EQUITIES, INCORPORATED,

                              Third Party Defendants - Cross Defendants-
                                        Appellees - Cross-Appellants,

                              versus

DAVID JOHNSTON; DAVID JOHNSTON CORPORATION,

                              Third Party Defendants - Cross Claimants-
                                                Cross Defendants,

                              versus

LEE R. LARKIN; ARCH McNEIL,

                    Cross Claimants-Counter Plaintiffs-Appellants.

_____

            Appeals from the United States District Court for the
                        Western District of Texas
_____
                          May 12, 1999
Before JOLLY, WIENER, and PARKER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

    This case involves the alleged malfeasance of numerous parties

to a transaction in which the principal asset of Barton Lodge II,

Ltd. ("BL II"), a limited partnership, was sold by the general

partner to stave off a foreclosure sale.  The district court

dismissed the case in a series of summary judgment rulings, and

three of the parties to the litigation, George Thomas, Lee R.

Larkin and Arch McNeil, now appeal.  We hold that the district

court erred in part when it held that the plaintiffs failed to

allege actual damages.  In most respects, however, we affirm the

2

district court's summary judgment rulings, including its ruling that the statute of limitations barred various claims and that the case of Newton v. Mallory, 601 S.W.2d 181 (Tex.Civ.App. – Dallas 1980, no writ), applies to bar the largest part of the alleged damages.  We therefore affirm in part, reverse in part and remand.

I

The facts regarding the events leading up to the current dispute are contested by the parties.  To the extent possible, we will present those facts to which all parties agree, and then turn to the respective versions of events alleged by the defendants and the plaintiffs in this case.

A

BL II is a Texas limited partnership, which was formed on September 1, 1982, to construct and own an apartment project ("the Project") in Austin, Texas.  The partnership consisted of a general partner, who contributed $99 in capital to the partnership and 56 limited partners who each contributed approximately $50,000 in capital to the partnership.  The general partner of BL II was PHAM-Barton Lodge II Limited Partnership ("PHAM").  PHAM itself was a partnership made up of a number of general partners, one of which, Ron Beneke, is a named defendant in this case.  The named plaintiff in this case, George Thomas, was one of the limited partners in BL II.

3

In order to finance the Project, BL II obtained a loan from University Savings Association ("USA") for $8.75 million in exchange for a security interest in the Project.  In 1986, BL II defaulted on the mortgage.  In 1990, the Resolution Trust Corporation (the "RTC"), which had inherited the mortgage from USA, posted the Project for a May 1, 1990 foreclosure sale.

On April 2, 1990, PHAM sent a letter ("the April 2 letter") to the limited partners proposing a sale of the project.  The letter stated:

> Although you have thirty days within which to make your decision under the terms of the partnership agreement, an immediate response is requested because the general partner has been informed by the current holder of the project indebtedness that unless these consents are received in time to permit the project to be sold on April 30, 1990, in the transaction described herein, it is likely that the project will be foreclosed by the holder of the mortgage indebtedness as soon as legally possible after May 1, 1990.

The letter went on to describe the proposed transaction:

> The General Partner proposes to sell the Project in a simultaneous two step transaction.  In the first phase, the Partnership would sell the Project to David Johnston Corporation ("DJC"), which is a corporation owned by David Johnston who is affiliated with members of the General Partner, in exchange for $10,000 cash and subject to the outstanding indebtedness on the Project at the date of the sale. . . . The purchaser also will agree to pay  the Partnership 70.175% of any sums it receives, if, as and when received, pursuant to contract rights granted to the purchaser in the second phase of the transaction. These contract rights will include 35.625% of any (i) Net Dispositions and Refinancing Proceeds and (b) Net Cash Flow (each as hereinafter defined) from the Project. Since the Partnership will be receiving 70.175% of the purchaser's 35.625% contract rights, the Partnership will

4

actually receive 25% of such amounts generated from the Project.

DJC intends to ask the Resolution Trust Corporation ("RTC"), which currently holds the mortgage indebtedness on the Project, to reduce the total payoff for the outstanding indebtedness on the Project to $6,800,000. Because DJC intends to use the proceeds from the second phase of the transaction to pay off the outstanding indebtedness on the Project and because such payoff will remove a non-performing asset from the RTC's portfolio without the need for foreclosure or the advance by the RTC of further funds, the General Partner believes that the RTC will agree to accept the reduced payoff from DJC. However, there can be no assurance in this regard.

After paying off the reduced debt on the Project, DJC will sell the Project to Alliance/PCA ("Alliance"). The sales price will be (a) $6,844,000 in cash, (b) 35.625% of any Net Disposition and Financing Proceeds (as described below) that Alliance receives when and if it refinances or disposes of the Project, and (c) 35.625% of all Net Cash Flow from the Project, meaning operating income less debt service and preferential return on capital (including any accruals thereof) and expenses of operating, managing, repairing, maintaining and improving the Project. It is highly unlikely that there will be any Net Cash Flow from the Project. Alliance is a joint venture whose members include affiliates of General Electric Capital and a company to be owned by partnerships and/or trusts for the benefit of the members and/or families of members of the General Partner.

The acquisition cost of the Project will be financed through loans and/or equity contributions from affiliates of General Electric Capital and/or Alliance/PCA (the "Acquisition Advance"). The Acquisition Advance is estimated at $6,995,000 including closing costs of $25,000 plus a one point brokerage fee to the Melody Company, one point to General Electric Capital Affiliates and one-half point to PCA affiliates.

On April 26, 1990, Thomas sent a letter to PHAM refusing to consent to the proposed sale. In that letter he stated:

I believe the General Partner on this proposed sale is looking after his own interest at the expense of the limited partner and the limited partner is left "holding the bag."

5

There may also be mismanagement and incompetence, as well as conflict of interest in negotiating with the lender and the proposed buyer, and I am planning to consult my attorney about legal remedies.

On April 30, 1990, the Project was sold in a two-step transaction, first to David Johnston Corporation ("DJC"), then to Alliance/PCA Apartment Portfolio I Limited Partnership ("A/PCA Portfolio"). A/PCA Portfolio is a limited partnership made up of a general partner, Alliance/PCA Company, and two limited partners, HBC Partners ("HBC") and General Electric Real Estate Equities, Inc. ("GE Equities"). The transaction effectively took place pursuant to the description in the April 2 letter. DJC paid the proposed $10,000 to BL II and received the Project subject to the mortgage indebtedness. DJC also agreed to pay BL II 70.175% of its 35.625% contract rights under the sale of the project to A/PCA Portfolio. DJC then sold the Project to A/PCA Portfolio in exchange for $6,795,000 and its 35.625% contract rights. The RTC released DJC of the mortgage indebtedness in exchange for $6,750,000. In order to purchase the Project from DJC, A/PCA Portfolio borrowed approximately $6,900,000 from General Electric Capital Corporation ("GE Capital").

On September 7, 1990, PHAM sent a letter to the limited partners stating that the Project had been sold on April 30, 1990. In December 1990, A/PCA Portfolio sold the Project to Clayton, Williams & Sherwood for $8,839,500. Under its contract rights, DJC

received $407,046.  DJC then paid $285,645 to the limited partners and retained $121,402.  The overall consequences to the limited partners of the transaction were that they received a final payout of approximately $5,000 on an initial investment of $50,000 and they received approximately $45,000 in reportable capital earnings for tax purposes.

B

We now proceed to the version of events presented by the defendants in this matter.  We note that what we iterate now essentially amounts to allegations made by the defendants.  For purposes of this appeal, we pass no judgment as to the relative truth of these allegations.

According to the defendants, BL II, like many real estate ventures from that period was simply a business failure.  In the mid-80s it became increasingly apparent that BL II's revenues from leasing apartments simply could not produce enough money to pay the interest payments owed on the mortgage.  From 1987 on, BL II was incapable of making interest payments on its loans.  By 1990, BL II owed approximately $10,750,000, and the value of the Project at the time was approximately $7,500,000.  After doing everything in its power, PHAM finally conceded defeat and sought to negotiate a bailout.

The defendants argue that, at the time, Alliance/PCA was in the process of purchasing several other failed projects and was in

7

a position to negotiate a favorable deal with RTC by resolving several outstanding loans at once. Recognizing that PHAM would not be able to obtain as much debt forgiveness for BL II by directly negotiating with the RTC as Alliance/PCA could, PHAM elected to sell the project to an Alliance/PCA affiliate in exchange for a percentage of the final sale of the Project after Alliance/PCA had successfully renegotiated the debt.

The defendants further argue that, given the pressure on PHAM from the looming foreclosure sale, PHAM took every reasonable precaution it could to finalize the transaction in a principled and conscientious manner. PHAM sent out the April 2 letter notifying the limited partners of the transaction and notifying them that the parties purchasing the Project had affiliations to members of PHAM. PHAM then received approval from a majority of the limited partners in BL II and proceeded with the sale. The defendants argue that, if PHAM had not negotiated the sale, BL II would simply have lost the Project without getting anything back on it and BL II's limited partners would have received less money and less favorable tax consequences.

C

Thomas, McNeil, and Larkin ("the plaintiffs") allege a significantly different version of events. Again, in iterating the allegations made by the plaintiffs, we note that we pass no judgment as to the verity of these assertions.

8

To fully understand the plaintiffs' version of events, it is necessary to first understand the make-up of PHAM, the general partner of BL II. PHAM originally consisted of four managing general partners, Paul Hinch, Charles Miller, Paul Austin, and Mack Pogue, and two general partners, Ron Beneke and Hugh Caraway. Of these six partners, three of them, Hinch, Beneke, and Caraway were also affiliated with numerous other limited partnerships. These three, for example, were all partners in HBC, the limited partner of A/PCA Portfolio. In addition, all three were affiliated with the Property Company of America, Inc. ("PCA") and the Property Company of America Management, Inc. ("PCA Management"), the manager of A/PCA Portfolio.

The BL II partnership agreement only permitted the managing general partners of PHAM to act on behalf of BL II. At some point after 1984, all of the managing partners of PHAM resigned. Although he did not have the power to do so under the BL II agreement, Beneke assumed the role of managing partner of PHAM with respect to BL II. In 1989, PHAM dissolved. The limited partners of BL II were not notified of this development. At that point, Beneke arguably had no authority whatsoever to act on behalf of BL

II.[1]  He nevertheless negotiated the sale of the Project in April of 1990.

The plaintiffs do not dispute that BL II consistently lost money in the 1980s.  They do, however, dispute that PHAM was blameless in its actions leading up to the April 30, 1990 sale.  First, they argue that PHAM took actions that violated the terms of the BL II partnership agreement.  Specifically, under the agreement, PHAM was obligated to make operating deficit loans ("ODL's) to BL II in the event that BL II was unable to meet its obligations under the mortgage.  In addition, they argue that PHAM amended the BL II agreement without notifying or obtaining the approval of the BL II limited partners.  This amendment permitted PHAM to avoid liability for incurred cost overruns and operating expenses that further hindered BL II's ability to meet its loan obligations.  The plaintiffs also argue that, at a time when BL II was supposedly unable to make interest payments on its mortgage, PHAM was funneling funds from BL II to PCA.  Had PHAM not engaged in these activities, the plaintiffs argue, BL II would not have faced as significant a level of indebtedness as it did.

---

[1]If this point is correct, it would technically be more appropriate to refer to Beneke's actions on behalf of BL II as his actions, rather than PHAM's actions.  For some semblance of clarity, however, we refer to actions by an entity acting as the general partner of BL II as actions of PHAM, without passing judgment on this issue.

The plaintiffs go on to assert that Beneke and the other parties to the transaction realized that the value of real estate was increasing and recognized an opportunity for personal gain. By forcing a foreclosure of the Project, the defendants would be able to reap the benefits of a forced sale. The plaintiffs allege that Beneke intentionally misled the limited partners into believing that it was necessary to sell the Project through the April 2 letter.

The plaintiffs furthermore argue that there were numerous procedural errors in the attempt to obtain approval of the transaction. First, the plaintiffs argue that because DJC and A/PCA Portfolio were affiliates of PHAM partners, the proposed sale required unanimous consent from the limited partners under the BL II partnership agreement. The plaintiffs also argue that PHAM did not obtain a majority approval from the limited partners until after PHAM had completed the sale.

Finally, the plaintiffs argue that remaining funds owned by BL II, after the sale of the project, were misappropriated by the defendants. After the Project was sold, BL II still had a note from PCA for a $500,000 loan. In addition, BL II had a bond reserve fund valued at $162,611. Finally, the plaintiffs assert that BL II had furniture and equipment that was not subject to the mortgage. The plaintiffs argue that there was never an accounting for the value of any of these items.

11

Thomas sued multiple parties for their role in the sale of BL II's property. For purposes of this appeal, among the defendants, there are two remaining factions who have not settled. First, there is Beneke, who acted as the general partner of PHAM. Thomas sued Beneke for breach of fiduciary duties, breach of contract, actual, constructive and statutory fraud, negligence and gross negligence, conversion, breach of duty of good faith and fair dealing, civil conspiracy, Racketeer Influenced and Corrupt Organizations Act ("RICO") violations, and fraudulent transfer. The other group consists of GE Capital and GE Equities ("the GE defendants"). They were sued for breach of fiduciary duties, breach of contract, actual and constructive fraud, negligence and gross negligence, conversion, civil conspiracy, RICO violations, and fraudulent transfers.

Thomas's lawsuit was fashioned as a derivative suit on behalf of BL II. In response to the suit, Beneke counterclaimed against BL II and joined each of the limited partners in their individual capacity. Besides Thomas, the only other limited partners still involved in the suit are Lee R. Larkin and Arch McNeil. McNeil and Larkin filed a counterclaim against Beneke and cross-claims against the other defendants, essentially alleging the same causes of action alleged by Thomas on behalf of BL II.

The district court disposed of the case with a procession of orders. On February 7, 1997, the court issued two orders. In the first, an Order Granting in Part and Denying in Part Motion for Summary Judgment as to the Statutes of Limitations ("SOL Order"), the district court held that the claims based on breach of contract, RICO violations, fraudulent transfers and fraud are subject to four-year statute of limitations while the claims based on breach of duty of good faith, negligence and gross negligence, conversion, DTPA violations, breach of fiduciary duties, and conspiracy are subject to a two-year statute of limitations. The court then held that all claims subject to a two-year statute of limitations were barred. In the second order, Order Denying Third Party Defendant Arch McNeil's Motion for Summary Judgment ("McNeil Order"), the court rejected McNeil's argument that, under § 16.069 of Tex.Civ.Prac.&Rem.Code, a counterclaim or cross-claim is revived from a statute of limitations bar.

On March 2, 1997, the district court judge, Judge Royal Furgeson, held that because of a potential conflict of interest, the case should be transferred to Judge Lucius D. Bunton.

Then, on May 8, 1997, the court issued an order ("No Damages Order") that effectively resolved the case. In that order, the court first noted that, for the remaining claims (breach of contract, RICO violations, fraudulent transfers and fraud), the plaintiff must prove damages. The court found that at the time the

13

project was sold, BL II owed $10,705,830, and that the value of the project was $7,500,000. The court held that because the total damages claimed by plaintiffs on behalf of BL II were $8,216,152, even if the plaintiffs claims were upheld, BL II would not recover any damages, as those damages would have been owed to the RTC.

Finally, on May 22, the court entered an order that operated to strike confessions of judgment related to the case ("Strike Order"). On June 3, 1997, the court entered an order to clarify that the court's No Damages Order and Strike Order had disposed of all remaining claims, cross-claims, and counterclaims in the case ("Final Order").

### III

The parties associated with this case raise multiple issues on appeal. Because of the complexity of the case, we address each issue raised in relation to its corresponding court order. The first ruling with which the parties take issue is the SOL Order. Thomas argues that the district court erred in granting in part the defendants' motion for summary judgment pursuant to the statute of limitations. The GE defendants, on the other hand, argue that with respect to them, claims based on fraud should be barred by the limitations period. We find no error with the district court's limitations ruling and therefore affirm it.

The next contested ruling is the McNeil Order. McNeil argues that the district court incorrectly applied Texas law to his

14

procedural claim that, because he is a cross-claimant, his claims are not barred by the statute of limitations. Because we agree with the district court that McNeil and Larkin are asserting the same claims asserted by Thomas, we also affirm the district court on this issue.

The next issue raised on appeal by Thomas is whether the district court erred when it issued its No Damages Order. Thomas contends that the district court misapplied Texas law when it concluded that the indebtedness of lost property must be factored into the value of what is lost when a party alleges actual damages. Thomas further argues that, even if the court correctly applied the law, the court still erred in calculating the damages alleged by Thomas. The defendants argue that the district court appropriately concluded that Thomas had failed to demonstrate any damages and that Thomas's claims should therefore be dismissed. We find Thomas's second argument persuasive and therefore reverse and remand on this issue.

Next, McNeil and Larkin protest the dismissal of their claims pursuant to the Final Order. The Final Order, however, is based on the district court's No Damages Order, which we reverse in part. We therefore hold that, to the extent that our opinion reinstates Thomas's claims, McNeil and Larkin's claims also are reinstated. The GE defendants cross-appeal arguing that McNeil and Larkin's cross-claims are not permitted under the Federal Rules of Civil

15

Procedure. We hold that McNeil and Larkin have properly filed cross-claims pursuant to the Federal Rules of Civil Procedure.

Finally, Beneke argues that, even if he is not entitled to summary judgment on the damages issue, he is nevertheless entitled to summary judgment on other grounds. Because the district court has not addressed this argument, we remand for an initial determination by that court.

## IV

This case was determined on the basis of a series of summary judgment motions. We therefore review under our standard for summary judgment. Summary judgment is proper if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

A summary judgment ruling is reviewed de novo, applying the same criteria employed by the district court. Conkling v. Turner, 18 F.3d 1285, 1295 (5th Cir. 1994). We therefore must determine "whether the summary judgment evidence on file shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Ruiz v. Whirlpool, Inc., 12 F.3d 510, 513 (5th Cir. 1994) (citing Hibernia National Bank v. Carner, 997 F.2d 94, 97 (5th Cir. 1993).

16

When a moving party alleges that there is an absence of evidence necessary to prove a specific element of a case, the nonmoving party bears the burden of presenting evidence that provides a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party....  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

V

In its SOL Order, the district court held that all of the claims, with the exception of the claims for fraud, fraudulent transfer, breach of contract, and RICO violations, were subject to two-year limitations periods.  The district court then held that the cause of action accrued on the date of the sale, April 30, 1990.  Because Thomas did not file his case until October 1, 1993, and because the district court found that no doctrine of equitable tolling applied, the district court held that all claims subject to a two-year limitations period are barred.  Thomas argues that the district court erred when it held that some of Thomas's claims were barred by the statute of limitations.   The GE defendants argue that the district court erred in not barring the fraud claims alleged against them.  We will address each argument in turn.

17

A

Thomas makes two arguments regarding the SOL Order. Thomas first argues that the trial court improperly applied a two-year limitations period to BL II's Breach of Fiduciary Duty and Conspiracy to Commit Fraud Claims. Thomas also argues that the trial court failed to properly apply various tolling doctrines to the case.

1

Thomas argues that there is a four-year limitations period for breach of fiduciary duty. The district court followed the clear and unambiguous language of <u>Kansas Reinsurance Co., Ltd. v. Congressional Mortg. Corp. of Texas</u>, 20 F.3d 1362 (5th Cir. 1994) and held that a Texas breach of fiduciary duty claim is subject to a two-year statute of limitations. Thomas now asks us to ignore this case and instead look to our decision in <u>Castillo v. First City Bancorporation of Texas</u>, 43 F.3d 953, 960 (5th Cir. 1994). <u>Castillo</u>, however, deals with a claim for duress. In short, the district court relied on binding Fifth Circuit precedent to reach its conclusion that the limitations period for breach of fiduciary duty is two years. There are no cases on point that provide support for a different approach. We therefore affirm the district court.

Thomas also contends that the district court erred when it held that civil conspiracy claims are subject to a two-year statute of limitations. Thomas relies on <u>Lone Star Partners v. NationsBank Corp.</u>, 893 S.W.2d 593, 601 (Tex.App.--Texarkana 1994, writ denied), and <u>Atlantic Life Ins. Co. v. Hurlbut</u>, 696 S.W.2d 83, 102 (Tex.App.--Dallas 1985), rev'd on other grounds, 749 S.W.2d 762 (Tex. 1988), for support. Neither of these cases actually stand for Thomas's proposition that a civil conspiracy claim is subject to a four-year statute of limitations. The district court cites to <u>Stevenson v. Koutzarov</u>, 795 S.W.2d 313 (Tex.App.--Houston [1st Dist.] 1990, writ denied), and <u>Chevalier v. Animal Rehabilitation Center, Inc.</u>, 839 F.Supp. 1224 (N.D. Tex. 1993), for the proposition that the limitations period is two years. We find the reasoning in <u>Stevenson</u> and <u>Chevalier</u> persuasive, and affirm the district court.

The district court held that the action accrued at the time the project was sold. In response to Thomas's argument that the discovery rule should toll the limitations period, <u>see, e.g.</u>, <u>Computer Associates Intern., Inc. v. Altai, Inc.</u>, 918 S.W.2d 453, 456 (Tex. 1996), the district court held that the plaintiffs discovered enough to investigate the injury shortly after the sale. The district court noted that:

> The nature of a derivative action fundamentally alters the application of the discovery rule. Ordinarily, it is the knowledge of the party bringing the action which is determinative of the extent to which the discovery rule will toll limitations. In a limited partnership derivative action, however, the party bringing the action is the limited partnership itself. The knowledge of a general partner would ordinarily be imputed to the limited partnership. . . . However, if BL II were to be charged with the knowledge of PHAM, it would be commensurate with the court holding that the limited partners are barred from proceeding because PHAM was aware that the actions taken by PHAM were wrong. The law does not countenance such inequities. Given that a derivative action by the limited partners in a limited partnership is effectively a suit on behalf of the limited partners, it is really the knowledge of the limited partners that should be charged to the limited partnership. Therefore, it is the knowledge of the limited partners as a class that will be imputed to the limited partnership.

The district court held that, upon receipt of the April 2, 1990 letter from PHAM that explained the sale of the Project and the potential conflicts involved and given the subsequent sale, a reasonable person would have conducted further inquiries.

Thomas first argues that the court improperly imputes the knowledge of one limited partner (i.e., Thomas's knowledge) to the rest of the partnership. However, as the cited passage illustrates, the district court did not consider the knowledge of any one particular partner but instead considered the knowledge of the limited partners as a class. As opposed to the alternative, applying partnership law to impute the knowledge of the general partner to the partnership as a whole, this approach strikes us as eminently practical and sound.

Thomas also argued that the limitations period should be tolled by the doctrine of fraudulent concealment, the doctrine that a defendant who fraudulently conceals a cause of action is estopped from asserting a limitations defense. Nichols v. Smith, 507 S.W.2d 518, 519 (Tex. 1974). The district court noted that "there cannot be fraudulent concealment of facts which admittedly were or should have been known by [the plaintiff]" Timberlake v. A.H. Robins Co., Inc., 727 F.2d 1363, 1366-67 (5th Cir. 1984) (quoting Fusco v. Johns-Manville Products Corp., 643 F.2d 1181, 1184 (5th Cir. 1981)). The district court held that the limited partners should have had knowledge when informed of the sale of the project. Thomas argues first that the defendants had an increased obligation to inform the plaintiffs given their fiduciary duties, and, second, that the district court ignored a number of affirmative fraudulent misrepresentations made by the defendants. Neither of these

arguments addresses the basis for the district court's ruling.  The district court held that, at the point when the limited partners suffered significant damages from the sale of the project, they had enough knowledge to investigate and a reasonable investigation would have led the partners to file a claim in court.  We find no error in the district court's holding.

Thomas next seizes upon language in the district court's opinion stating that a reasonable investor, upon receiving the April 2 letter, would have looked to the partnership agreement in investigating the transaction.  Thomas argues that the courts have held that shareholders should not have an affirmative duty to consult the books of a corporation.  There are two problems with Thomas's argument.  First, it ignores the difference between shareholders, who often are not sophisticated investors, and the limited partners here, who clearly were.[2]  Second, the court does not rest its holding that the action was discoverable solely on

---

[2]We note that a rule relieving shareholders of an obligation to be familiar with the books of a corporation is significantly different from a rule relieving partners of a similar obligation with respect to their partnership agreement.  For one thing, each partner clearly has easy access to the partnership agreement, whereas a shareholder may not be able to easily review the books of a corporation.  For another thing, each partner participates in forming the partnership agreement: there must be an affirmative act on the part of the partner to consciously comprehend and acquiesce to the terms of the agreement.  Even if a limited partner has not taken a role in negotiating the terms of the partnership agreement, he still must be familiar with them at the time he joins the partnership.

22

information in the partnership agreement.  Instead, the court notes that the April 2, 1990 letter should have lead the limited partners to investigate further, and that a consultation of BL II's partnership agreement would have demonstrated that the sale required unanimous consent.

Thomas also takes issue with the court's principal rationale for concluding that the cause of action was discoverable at the time the property was sold because the limited partners received notice through the April 2, 1990 letter.  The letter informed the limited partners that the project would be sold in the face of a foreclosure sale, that the sale likely would result in considerable losses to the limited partners, and that the purchasers of the project were affiliated with the general partner.[3]  From this letter, the district court concluded that the limited partners should have had enough information to investigate the transaction. Thomas argues that this letter only informs the limited partners of a potential loss, not of the basis for a claim of fraud.  However, this claim ignores the district court's reasoning that a letter

_____

[3]The plaintiffs argue that the letter does not state that the purchasers were affiliated with the PHAM.  The text of the letter indicates otherwise: "the Partnership would sell the Project to David Johnston Corporation ("DJC"), which is a corporation owned by David Johnston who is affiliated with members of the General Partner. . . .  DJC will sell the Project to Alliance/PCA ("Alliance"). . . .  Alliance is a joint venture whose members include affiliates of General Electric Capital and a company to be owned by partnerships and/or trusts for the benefit of the members and/or families of members of the General Partner."

23

disclosing an interested transaction that results in significant losses to sophisticated investors should provide the basis for those investors to investigate whether there may be potential fraud.

Finally, Thomas argues that the district court's ruling leads to a result that rewards dishonest fiduciaries. The district court's ruling, however, is properly limited to the statute of limitations issue. Whenever a plaintiff is barred from filing a claim because of the statute of limitations, there is always a risk that the plaintiff's claim is meritorious and that the defendant's improper conduct has been rewarded. That result alone, however, cannot form the basis for opening the courts to the plaintiff.

B

On cross-appeal, the GE defendants argue that the district court incorrectly applied a four-year statute of limitations to the claims against them for fraud and fraudulent transfers. With respect to the GE defendants, the claims are based on a theory of vicarious liability. The district court held that, under established Texas law, "[e]ach party to a fraudulent transaction is responsible for the acts of the others done in furtherance of the scheme." Crisp v. Southwest Bancshares Leasing Co., 586 S.W.2d 610, 615 (Tex.Ct.App.--Amarillo 1979, writ ref'd n.r.e.)(citations omitted). The defendants argue that vicarious liability, like conspiracy, should be subject to a two-year statute of limitations.

24

As we have stated above, conspiracy claims are clearly subject to a two-year statute of limitations period. There does not, however, appear to be a precedent of a Texas court applying a two-year statute of limitations to an aiding and abetting claim. Because there is no binding Texas law on the subject, we must make an Erie guess as to the appropriate limitations period. We hold that, where a claim of fraud is based on a defendant aiding and abetting a co-defendant, the appropriate limitations period is the same as the underlying fraud, four years.

V

McNeil and Larkin filed a motion for summary judgment in which they argued that under Tex. Civ. Prac. & Rem. Code § 16.069, even if Thomas's claims are barred by the statute of limitations, their claims should be revived as they are cross-claims or counterclaims.[4] Under § 16.069, a cross-claim or counterclaim filed within thirty days of a required answer to the original claim may be filed even though it would be barred by the statute of limitations if filed separately. In this case, the district court held that McNeil's claims were nevertheless barred as McNeil had effectively filed a derivative claim on behalf of BL II. The district court relied on Hobbs Trailers v. J.T. Arnett Grain, 560

---

[4]McNeil and Larkin presented conflicting arguments in their briefs regarding the appropriate label for their claims. See infra, note 6. This uncertainty does not affect our analysis for purposes of § 16.069.

S.S.2d 85 (Tex. 1971), that states: "the statute [§ 16.069] may not be applied to the situation in which the original plaintiff becomes the nominal defendant." The district court concluded that, because the original plaintiff was BL II and because McNeil could only file claims on behalf of BL II, § 16.069 could not be applied to revive claims otherwise barred by the statute of limitations. McNeil does not explain why Hobbs should not control in this instance. There is no dispute that the original plaintiff was acting on behalf of BL II and that McNeil, in filing cross-claims and counterclaims, acted on behalf of BL II. We therefore affirm the district court's ruling.[5]

## VI

We turn now to the order by the district court that had the greatest impact on this case. The district court effectively resolved the remaining claims of the case with its No Damages

---

[5]McNeil also argues that the McNeil Order is inconsistent with the SOL Order. This supposed inconsistency is that the McNeil Order treats McNeil's claim as a claim on behalf of the partnership while the SOL Order looks to the knowledge of the limited partners when determining the application of the discovery rule. As we have already explained, however, the SOL Order looks to the limited partners as a class. Again, the only reason why the SOL Order takes this approach is that, if it looked solely to the knowledge of the partnership under traditional partnership rules, it would have to impute to the partnership the knowledge of the general partner. Because BL II is made up of the general partner and the limited partners, the district court therefore concluded that only the knowledge reasonably available to the limited partners as a class should be imputed to BL II. The district court did not look solely to the knowledge of Thomas in making its decision. See supra, Part IV.A.

26

Order.  In determining the damages in this case, the district court followed the rule in Newton v. Mallory, 601 S.W.2d 181, 182 (Tex.Civ.App. – Dallas 1980, no writ), that "the value of the land lost is the fair market value of the land at the time of foreclosure, less the indebtedness due thereon."  After adding up the various damages claimed by the plaintiff, the district court concluded that the damages were less than the amount of indebtedness at the time the project was sold.

In order to properly address this issue, we must first review Texas law as it pertains to damages.  We then revisit the district court's treatment of the damages claimed by the plaintiffs under the remaining causes of action. Finally, we turn to the issue of whether, in the light of Thomas's claimed damages, the district court correctly dismissed this case.

A

Under Texas law, "[t]he general principle of damages is compensation to plaintiff for his actual loss resulting from defendant's wrong."  McClung Cotton Co., Inc. v. Cotton Concentration Co., 479 S.W.2d 733, 737 (Tex.Civ.App.--Dallas 1972, writ ref'd n.r.e.) (Citing Chicago, M. & St. P. Ry. v. McCaull-Dinsmore Co., 253 U.S. 97 (1920); Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484 (1952)).  Damages must be alleged with specificity:  "Although damages need not be established with mathematical precision, the evidence must provide a basis for

27

reasonable inferences." <u>Dyl v. Adams</u>, 167 F.3d 945, 947 (5th Cir. 1999).

We have found no Texas Supreme Court case that defines the appropriate measure of damages in a case such as this. However, in the case of <u>Newton v. Mallory</u>, the Court of Civil Appeals for Dallas, Texas, encountered an analogous question. 601 S.W.2d 181 (Tex.Civ.App. – Dallas 1980, no writ). In <u>Newton</u>, a partnership was formed to invest in a property. One of the partners loaned money to the partnership in exchange for a vendor's lien on the property. A partner was appointed as a managing partner and another was appointed as a trustee. These two partners were given the responsibility of collecting payments from the partners to pay installments on the loan. When some of the partners ceased making their contributions, the managing partner and trustee ceased making payments without notifying the partnership. The result was a foreclosure sale on the property. Some of the partners then sued. As damages, they sought to recover their initial contribution to the partnership. The court, however, rejected this measure of damages. Instead, the court held that, where a partnership lost its principal asset as a result of foreclosure, the measure of damages should be the value of the property lost less the mortgage indebtedness of the property. <u>Newton</u>, 601 S.W.2d at 182.

Because there is no Texas Supreme Court ruling on this issue, we must make an <u>Erie</u> guess regarding Texas law on this subject. As

we stated in U.S. v. Johnson, 160 F.3d 1061, 1063-64 (5th Cir. 1998), "[i]n the absence of Texas Supreme Court pronouncements, we generally defer to the holdings of lesser state courts unless we are convinced by other evidence that the state law is otherwise." We have no reason to doubt that the decision in Newton represents Texas law.  We therefore adhere to its reasoning that, in a situation such as this--where a general partner's action results in lost property owned by the partnership--the partnership must account for the indebtedness of the lost property when seeking to recover the actual damages for its loss.

B

In its No Damages Order, the district court carefully reviewed the damages alleged by Thomas.  These damages consisted of the following:

| | |
|---|---:|
| Note to PCA not Repaid | $522,856.00 |
| BL II's Cash on Hand | $4,073.00 |
| Freeze Damage Insurance Proceeds | $26,612.00 |
| BL II's Bond Reserve Fund | $162,611.00 |
| Value of the lost project | $7,500,000.00 |
| Furniture and Equipment | not specified |
| Cost Overruns not Funded | $339,047.00 |
| Operational Expenses not Funded | $1,098,670.00 |
| Operational Deficit Loans not Made | $931,030.00 |
| Total: | $10,584,899.00 |

The district court then concluded that the damages from cost overruns and operational expenses not funded and from operational deficit loans not made each occurred before 1989 and were therefore barred by the statute of limitations. The district court also held that the plaintiffs failed to demonstrate that the furniture and office equipment was not secured by the original $8.75 million dollar loan. The court further held that the plaintiffs had failed to quantify the value of the furniture and equipment. Based on these findings, the court disregarded the plaintiffs' damages claims with respect to these items. The court therefore held that plaintiffs' alleged damages amounted to $8,216,512.00.

The court then found that the outstanding debt on the Project at the time the Project was sold was $10,705,830.00. Based on this finding and the holding in Newton, the court concluded that the

30

plaintiffs had failed to demonstrate a loss that was greater than the outstanding indebtedness on the property.

C

On appeal, Thomas argues that <u>Newton</u> should not apply to the calculation of actual damages in this case. Thomas next argues that, even if Newton should apply, the district court erred in calculating the value of the damages and the outstanding indebtedness. Finally, Thomas argues that the district court erred when it treated property owned by BL II after the sale of the project as subject to the mortgage indebtedness.

1

Thomas's first argument is that <u>Newton</u> should not apply to the calculation of actual damages here. We generally agree with Thomas that the result reached by applying <u>Newton</u> to this case is troublesome. There is a straightforward explanation for why this is so. In <u>Newton</u>, the managing partner and trustee lost the property through foreclosure and suffered the same losses as the other partners in the partnership. In this case, the General Partner actually turned a profit on the sale of the Project. While it is not entirely clear how much money Hinch, Beneke, and Carraway (all general partners in PHAM) made, it is apparent that the sale of the Project, after the RTC's debt forgiveness, made a profit of as much as $2 million. Of that sum, only $285,000 made its way back to the partnership. Because Beneke's power under BL II's

31

Partnership Agreement to bring about the transaction is called into question by the participation of interested parties in the transaction, there appears to be a case for arguing that the parties to the transaction have been unjustly enriched through this transaction.

The fact that Newton's requirements make it difficult for the plaintiffs here to allege actual damages does not, however, leave the plaintiffs without a remedy. What is troublesome in this case is not just that the defendants sold the project for less than what it may have been worth, but also that the defendants seem to have profited from that sale. Under Texas law, the plaintiffs could, and did in their seventh amended complaint, seek a constructive trust. As we recently noted in Dyl v. Adams, supra, under Texas law, a constructive trust is appropriate to prevent unjust enrichment when a defendant has committed a fraud. 167 F.3d at 948. For whatever reason, this issue was not raised on appeal, and we are therefore unable to address it.

We hold however that, for actual damages, we are bound to apply the method used in Newton. In Newton, the court held that the plaintiffs could not rely on their initial contribution to the partnership as a measure of actual damages. The court looked instead to the value of what was lost, the property, and in valuing the property, the court considered the indebtedness of the property. In this case, Thomas does not argue that the original

32

contribution of the limited partners should be a measure of the actual damages of the partnership. Instead, he argues that the measure of damages should be the losses incurred by the partnership as a result of the conduct of the defendants, including their mismanagement of the project, their failure to reduce the indebtedness of the project, and their failure to obtain the best price for the project because of their self-interested dealing. However, because those damages are reflected in the value of the project when it was sold, the actual damages claimed by Thomas are identical in form to those addressed by the court in Newton.

As we have noted, in pleading actual damages under Texas law, the plaintiff must plead them with specificity. In this case, the plaintiffs' principal claim for actual damages is the loss of the value of the project because of the conduct of the general partner and the purchasers of the project. In Newton, the only claim was for the loss of the value of the land at the time of foreclosure because of the conduct of the general partner. The reasoning in Newton, that the court must account for the indebtedness of the lost property in calculating actual damages is equally applicable here. The plaintiffs are certainly entitled to show that the value of the property is higher than its indebtedness, but, under the reasoning in Newton, the court may not simply disregard the indebtedness of the property when determining the value of what was actually lost. Thus, for purposes of this appeal, we hold that in

calculating the actual damages suffered by BL II, the district court did not err in accounting for the indebtedness of the project when valuing the loss of the project through its sale.

2

Thomas next argues that the district court erred in its valuation of the damages claimed by Thomas and in its valuation of the outstanding mortgage indebtedness. After a careful review of the record, we cannot agree with any of these arguments. For instance, Thomas argues that the value of the land at the time the Project was sold was more than $7,500,000. However, Thomas did not certify an expert to provide testimony to support a different figure. Instead, Thomas produced two non-experts, neither of whom had an ownership interest in the Project, who provided their best estimates of the value of the land at the time of sale. We agree with the district court that this evidence is simply inadequate to support a different value for the project.

Thomas also argued that the amount of mortgage indebtedness was not the $10,705,830.00. Thomas points to the fact that the defendants were able to renegotiate the debt by almost $4 million as evidence that BL II would not have had to pay the full amount of its indebtedness. However, the defendants have argued and attempted to demonstrate that the debt renegotiation was part of a larger negotiation and that BL II could not have renegotiated the debt in the same way. Although we do not necessarily accept the

34

defendants' account as true, we note that there is no evidence that we could find in the record that would lead us to reject their argument as untrue--and the partnership carries the burden of proof on these damages.  As we have said, under Texas law when alleging damages, the plaintiff must allege them with specificity.  It is not enough to present conjecture about what might have happened, the defendant must present real evidence of his loss.  We can find no such evidence here.

The plaintiffs also take issue with the district court's exclusion of the damages from the missing furniture and equipment, the cost overruns and operational expenses not funded, and the operational deficit loans not made.  Because the amount of debt would still outweigh the damages claimed by the plaintiffs if we included these items as damages, we do not consider whether the district court erred in excluding these items.

3

Thomas finally argues that not all of the assets of BL II were sold with the Project.  After the sale, BL II still retained a note from PCA for $500,000, a bond reserve fund valued at $163,611, its cash on hand, and the freeze damage insurance proceeds.  Thomas argues that the value of those assets were never distributed among the limited partners, even though BL II maintained them *after* selling the project and escaping its debt.

35

Beneke argues that the summary judgment evidence demonstrated as a matter of law that the PCA note was held by BL II exclusively for the benefit of USA. Beneke further argues that the summary judgment evidence did not establish that BL II owned the bond reserve fund. After reviewing the record, we conclude that there is a genuine issue of material fact regarding the ownership of the PCA note, the bond reserve fund, BL II's cash on hand, and the freeze damage insurance proceeds. If these items were owned by BL II, there should have been an accounting for them upon the dissolution of the partnership. Furthermore, because these items were not tied to the Project, the district court should not have weighed them against the indebtedness of the Project when making its damages calculations. We hold that the district court erred in holding that the plaintiffs had alleged no damages as the plaintiffs properly alleged that they had lost the value of the PCA note, the bond reserve fund, BL II's cash on hand, and the freeze damage insurance proceeds, to which they may well be entitled. We therefore reverse the district court's No Damages Order to this limited extent.

The district court dismissed all of McNeil and Larkin's claims in the Final Order. McNeil and Larkin argue that both orders contain errors of law and fact. Because the Final Order dismissed McNeil and Larkin's claims pursuant to the No Damages Order and because we reverse that order, the claims dismissed by that order will now be reinstated.

The GE defendants have raised a purely legal question on cross-appeal related to McNeil and Larkin's claims. As described above, McNeil and Larkin were third party defendants brought into the suit by a claim made by the PCA defendants (of whom only Beneke remains in this appeal). With the exception of Beneke, the defendants have a procedural objection to the claims filed by McNeil and Larkin. Under Fed.R.Civ.P. 14(a), a third party defendant may assert claims arising out of the transaction against the original plaintiff, counterclaims against the third party plaintiff, and cross claims against a co-party under rule 13(g). The GE defendants argue that "[m]ost courts have accepted the definition set forth in <u>Murray v. Haverford Hospital Corp.</u>, 278 F.Supp. 5, 6 (E.D. Pa. 1968), where co-parties were defined as 'parties having like status, such as, co-defendants.'" <u>Georgia Ports Authority v. Construzioni Meccaniche Industriali Genovesi, S.P.A.</u>, 119 F.R.D. 693, 694 (S.D. Ga. 1988). The GE defendants argue that, as McNeil and Larkin do not share co-defendant status

with them, McNeil and Larkin cannot be co-parties under rule 13(g).[6]

Although some courts have held that third party defendants may not file cross-claims against original defendants under rule 14(a), the issue has not been addressed by the Fifth Circuit. We agree that a reading of rules 14(a) and 13(g) can lead to the conclusion that third party defendants are barred from filing cross-claims against original defendants. We, however, find this reading to be a strained one and the result nonsensical. Under rule 14(a), third party defendants can join additional parties to the lawsuit to resolve claims related to the claim made against them. It therefore seems strange to conclude that they cannot bring those claims against parties already involved in the suit. The practical effect of adhering to the defendant's reasoning would be to hold that when a third party defendant wishes to allege a claim against an original defendant, he must file a separate complaint against the original defendant and then move for joinder of the two actions. We will not require third party defendants to jump

---

[6]In their opening brief, McNeil and Larkin seem prepared to concede this point, arguing that they should have labeled their claims "counterclaims," but claiming that this was a harmless error nonetheless. The problem with this argument is that their claims against the non-Beneke defendants cannot be counterclaims as those defendants did not file any claims against them. McNeil and Larkin apparently concede this point in their reply brief when they state that there is "diverse authority on the issue of what to call their claims," but that there is nonetheless a "general principle . . . that [their] claims should go forward."

through these additional hoops. We hold that, under Rule 14(a), a third party defendant may file a cross-claim against an original defendant even if it would be inappropriate to characterize the third party defendant as a co-defendant of the original defendant.

VIII

Beneke argues that, even if the district court erred in its No Damages Order, there is another ground on which the district court could have granted summary judgment. Beneke argues that Thomas ratified the acts of the defendants by accepting the proceeds from the sale and the favorable tax treatment. Because the district court did not address this claim in its No Damages Order, we remand to the district court for an initial determination, if in the district court's judgment a resolution of this issue is necessary to properly conclude this case.

IX

In working its way through this convoluted case, the district court, admirably, committed only one error, an error in calculating damages. We hold that the district court correctly determined that the loss of the project did not result in actual damages to BL II as the value of the project at the time of the sale was less than the indebtedness of the project. The district court nevertheless erred when it dismissed the plaintiffs' claims on summary judgment, holding that the plaintiffs had not alleged any actual damages. The plaintiffs did allege claims for actual damages based on items

39

they assert were in the control of BL II after the sale of the project but not accounted for in the dissolution of the partnership. We hold that the district court erred when it failed to consider as part of the damages the plaintiffs' claims for the loss of the PCA note, the bond reserve fund, BL II's cash on hand after the sale of the project, and the freeze damage insurance proceeds. We therefore reverse the grant of summary judgment on these limited claims. We note, however, that Beneke argues that summary judgment is appropriate on other grounds. We leave this argument to the district court to resolve.

In sum, we therefore REVERSE the district court with respect to its summary judgment rulings on the issue of whether Thomas failed to demonstrate damages with respect to the limited claims noted above. In all other respects we AFFIRM the summary judgment rulings of the district court. We REMAND for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.