**UNITED STATES of America, Plaintiff**

**v.**

**Gerald C. LONG, et al., Defendants.**

**No. 1:12CV1209.**

United States District Court,
N.D. Ohio,
Eastern Division.

Signed March 26, 2014.

Julie Ciamporcero Avetta, Edward J. Murphy, Washington, DC, for Plaintiff.

Jennifer D. Armstrong, Richard H. Blake, McDonald Hopkins, Cleveland, OH, for Defendants.

*MEMORANDUM AND ORDER*

McHARGH, United States Magistrate Judge.

The plaintiff United States of America, pursuant to 26 U.S.C. §§ 6321, 6322, 7401, and 7403(a), filed a complaint against defendant Gerald C. Long ("Long"), for unpaid federal income tax liabilities for the years 2002 and 2004, and to enforce associated federal tax liens against real property located at 5435 East Heisley Road, Mentor, Ohio ("the East Heisley Property"). The complaint alleges that defendant Eleanor L. Puruczky ("Puruczky") holds record title to the East Heisley Property "as the nominee and fraudulent transferee of [Long], whose equitable ownership interest in the East Heisley Property is at least 50%." (Doc. 1, at 1.)

Currently before the court are the parties' motions for summary judgment.

The United States has filed a motion for summary judgment. (Doc. 48.) Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), has filed a memorandum in opposition (doc. 53), and the United States has

filed a reply brief (doc. 58). Defendants Long and Puruczky have filed a motion to incorporate by reference Wells Fargo's memorandum in opposition (doc. 54), which motion to incorporate is opposed by the United States (doc. 59).

Wells Fargo has also filed a motion for summary judgment. (Doc. 49.) The United States has filed a memorandum in opposition (doc. 55), as has defendant State of Ohio, Department of Taxation (doc. 51), and Wells Fargo has filed a reply brief in support of its motion (doc. 57). Defendants Long and Puruczky have filed a motion to incorporate by reference Wells Fargo's motion for summary judgment (doc. 50), which motion to incorporate is opposed by the United States (doc. 56).

## I. SUMMARY JUDGMENT

Summary judgment is appropriate where the record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). Non-moving parties may rest neither upon the mere allegations of their pleadings nor upon general allegations that issues of fact may exist. See *Bryant v. Commonwealth of Kentucky,* 490 F.2d 1273, 1275 (6th Cir. 1974). The Supreme Court held that:

> ... Rule 56(c)[1] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence need not be in a form admissible at trial in order to avoid summary judgment, but Rule 56(e) requires the opposing party:

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Id.* at 324, 106 S.Ct. 2548.

The Sixth Circuit in *Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir.1989), has interpreted Celotex and two related cases, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), as establishing a "new era" of favorable regard for summary judgment motions. Street points out that the movant has the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. *Street,* 886 F.2d at 1479.

The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion. *Kraus v. Sobel Corrugated Containers, Inc.,* 915 F.2d 227, 229 (6th Cir. 1990).

The standard for the motion filed by the United States, as plaintiff carrying the burden of proof on its claims, is somewhat

1. Now Rule 56(a).

different. A plaintiff-movant must present evidence that would entitle him to a directed verdict if that evidence were not controverted at trial. If the defendants respond to the motion with controverting evidence which demonstrates a genuine issue of material fact, plaintiff's motion must be denied. However, if, after analyzing the combined body of evidence presented by both parties, the evidence is such that no reasonable jury could find in favor of the defendants, then summary judgment will be entered on behalf of the plaintiff-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). See also *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368–1369 (Fed.Cir.2006); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986) (movant must establish all essential elements of claim or defense); *McGrath v. City of Philadelphia*, 864 F.Supp. 466, 473 (E.D.Pa.1994) (citing *National State Bank v. Federal Reserve Bank of N.Y.*, 979 F.2d 1579, 1582 (3d Cir.1992)).

## II. FACTUAL BACKGROUND

As mentioned earlier, the court will construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the non-movant. *Kraus*, 915 F.2d at 229. Because there are cross-motions for summary judgment before the court, the overall factual background will be set forth in accordance with plaintiff's presentation of facts. Any disputed factual issues will be addressed in the context of the specific motion at hand.

### A. 2000 Purchase of East Heisley Property

On Oct. 4, 2000, Gerald C. Long and Eleanor L. Puruczky jointly signed a Purchase Agreement for a single-family dwelling, the East Heisley Property. (Doc. 48, PX 1.) Long and Puruczky agreed to pay the sum of $253,450.00—a promissory note

for $5,000 earnest money, $95,000 escrow payment, and a conventional mortgage for $153,450. *Id.* The $5,000 note was jointly executed by Long and Puruczky. (Doc. 48, PX 2.)

Long and Puruczky were both listed as proposed insureds on the owner's title insurance commitment dated Oct. 5, 2000. (Doc. 48, PX 3.) In addition, both Long and Puruczky were listed as insured on the homeowners' policy premium notice. (Doc. 48, PX 4.)

The warranty deed dated Oct. 6, 2000, listed both Long and Puruczky as the grantees of the conveyance of the East Heisley Property. (Doc. 48, PX 5.) Long and Puruczky each admitted that they were co-grantees on the deed because they were to become co-borrowers on the 2000 mortgage. (Doc. 48, PX 6, Admission No. 1; doc. 48, PX 7, Admission No. 1.)

The HUD Settlement Statement dated Nov. 2, 2000, lists both Long and Puruczky as the borrower(s), and shows $98,050 as "funds deposited by Buyer," as well as a deposit of $5,000 and a mortgage of $153,450. (Doc. 48, PX 8.)

The Uniform Residential Loan Application for the East Heisley Property names Long as "borrower" and Puruczky as "co-borrower." The application states that title will be held in the names of Long and Puruczky. (Doc. 48, PX 9.) The resulting mortgage on the East Heisley Property lists both Long and Puruczky as the mortgagors (borrowers) of a principal sum of $153,450, and was signed by both Long and Puruczky. (Doc. 48, PX 10.) Both Long and Puruczky admit that Long made payments toward the 2000 Mortgage. (Doc. 48, PX 6, Adm. No. 5; doc. 48, PX 7, Adm. No. 5.)

### B. Jeannette Property

Long and Puruczky established a home equity line of credit on Oct. 20, 2000, in the

amount of $140,000, secured by real property located at 498 Jeannette Drive, Richmond Heights, Ohio ("the Jeannette Property"). (Doc. 48, PX 11.) That same day, Long and Puruczky (both listed as mortgagors) took out a mortgage for the same amount on the Jeannette Property. (Doc. 48, PX 12.)

On Nov. 20, 2000, the Jeannette Property was sold. The deed listed only Eleanor Puruczky as the Grantor. (Doc. 48, PX 13.) The settlement statement shows that $119,724.44 went to Fifth Third Bank to pay off the mortgage. (Doc. 48, PX 14.) Fifth Third filed a Satisfaction of Mortgage dated Feb. 6, 2001, indicating that the Oct. 20 mortgage of $140,000 was satisfied in full. (Doc. 48, PX 15.)

### C. Nov. 3, 2000 Transfer of East Heisley Property

By deed of Nov. 3, 2000, Long transferred his interest in the East Heisley Property, which Long and Puruczky had jointly purchased the previous month, to Puruczky through a quit-claim deed, "for the consideration of five dollars and other good and valuable consideration." (Doc. 48, PX 16.)

### D. Nov. 3, 2000 Transfer of Village Green Condominium

By deed of Nov. 3, 2000, Long transferred real property, Unit 18–A of the Village Green Condominium, 8912 Trotter Lane, Mentor, Ohio, to Puruczky "for the consideration of five dollars and other good and valuable consideration." (Doc. 48, PX 17.)

### E. 2001 Conviction of Filing False Tax Returns of Polgor

On January 21, 2001, the United States charged Long with three counts of filing false federal income tax returns on behalf of his wholly-owned business, Polgor, Inc. ("Polgor"). (Doc. 48, PX 18.) On May 18, 2001, Long pleaded guilty to one count of filing a false income tax return on behalf of Polgor, for the fiscal year ending April 1996. (Doc. 48, PX 19, 20.) Long was sentenced to eight months in prison, and one year of supervised release. (Doc. 48, PX 19.) A condition of the supervised release was that Long cooperate with the IRS "in the determination and collection of income taxes owed for the years 1993 through 1995," and an obligation to pay the taxes, once determined. (Doc. 48, PX 20, at 4.)

### F. 2001–2002 Transactions on East Heisley Mortgage(s)

On June 15, 2001, the 2000 mortgage (for $153,450) on the East Heisley Property was assigned to Mortgage Electronic Registrations Systems ("MERS"), as nominee for Homeside Lending, Inc. (Doc. 48, PX 21.)

In September 2002, Long and Puruczky jointly applied for another mortgage on the East Heisley Property, in the amount of $154,100. The summary of mortgage loan information, which they both signed on Sept. 3, 2002, named Long as "borrower" and Puruczky as "co-borrower." (Doc. 48, PX 22.) That same day, Long and Puruczky jointly executed an "Owner's Affidavit," swearing that they were jointly the sole owners of the East Heisley Property. (Doc. 48, PX 23.) They both signed a waiver of title insurance that same date. (Doc. 48, PX 24.)

The resulting mortgage of Sept. 3, 2002, on the East Heisley Property lists both Long and Puruczky as the borrowers of a principal sum of $154,100, and was signed by both Long and Puruczky. (Doc. 48, PX 25.)

The settlement statement shows that $151,531.54 went to Homeside to pay off the earlier (2000) mortgage. (Doc. 48, PX 26.) MERS, as nominee of Homeside, filed a Satisfaction of Mortgage dated Oct.

10, 2002, indicating that the 2000 mortgage of $153,450 was satisfied in full. (Doc. 48, PX 27.)

Both Long and Puruczky admit that Long made payments toward this 2002 Mortgage. (Doc. 48, PX 6, Adm. No. 6; doc. 48, PX 7, Adm. No. 6.)

### G. Income Tax Assessments for 2002 and 2004 Tax Years

Delegates of the Secretary of the Treasury made assessments against Gerald C. Long for income taxes, penalties, and interest, for an unpaid total balance due of $100,336.23, as of August 5, 2013. (Doc. 48, PX 28, Hill decl., ¶¶ 2,4.) Assessments related to the 2002 tax year totaled $97,751.29, as of that date, and assessments for the 2004 tax year totaled $2,584.94. (Doc. 48, PX 28, ¶ 2; PX 29.)

The IRS notified Long of the tax assessments due, and made demand for payment. (Doc. 48, PX 28, ¶ 3; PX 30.) Despite the notice and demand, Long has not paid the assessed liabilities in full. (Doc. 48, PX 28, ¶ 3.)

### H. Notices of Federal Tax Liens and IRS Collection Efforts

The plea agreement signed by Long required him to cooperate with the IRS "in the determination and collection of income taxes owed for the years 1993 through 1995," and to pay the taxes, once determined. (Doc. 48, PX 20, at 4.) Although the government concedes that the 1993–94–95 income tax liabilities are not at issue in this case, it notes that the IRS had to issue multiple written demands for payment of those liabilities. (Doc. 48, PX 30, at 1–2 (Notice of Mar. 14, 2003), 6–7 (Notice of Dec. 14, 2004), and 4–5 (Notice of July 27, 2005).)

Similarly, the IRS sent a notice of intent to collect unpaid tax liabilities concerning Long's 2002 liabilities on July 27, 2005. (Doc. 48, PX 30, at 8–9.)

The IRS recorded a Notice of Federal Tax Lien ("NFTL") regarding his 2002 income tax liabilities with the Recorder of Lake County on Dec. 26, 2003, and re-filed same on May 13, 2013. (Doc. 48, PX 31–32.)

In 2004 and 2005, the IRS filed Notices of Levy against Long's assets (annuities, securities) held by third parties to collect against Long's 1993, 1994, 1995, and 2002 tax liabilities. (Doc. 48, PX 33.)

The IRS filed an NFTL concerning Long's 2002 tax liabilities, naming Puruczky as his nominee, transferee, fraudulent conveyee, or alter ego, specifically attaching the East Heisley Property, on Feb. 8, 2005, and re-filed same on May 13, 2013. (Doc. 48, PX 34–35.)

Also on Feb. 8, 2005, the IRS filed an NFTL concerning Long's 1993, 1994, and 1995 tax liabilities, naming Puruczky as his nominee, transferee, fraudulent conveyee, or alter ego, specifically attaching the East Heisley Property. (Doc. 48, PX 36, at 1–2.) The IRS also filed an NFTL concerning Long's 1993, 1994, 1995, and 2002 tax liabilities, naming Puruczky as his nominee, transferee, fraudulent conveyee, or alter ego, specifically attaching the Village Green Condominium. (Doc. 48, PX 36, at 3–6.)

A Notice of Federal Tax Lien Filing, notifying Puruczky of her identification as the nominee, transferee or alter-ego for Long, was sent to Puruczky on Feb. 8, 2005. The Notice advised Puruczky of her right to appeal, and the possibility of applying for a certificate of discharge of the liens. (Doc. 48, PX 37.) Puruczky did not file an appeal. (Doc. 48, PX 7, Adm. No. 24.) However, the IRS granted her application for a discharge of the Condominium from the tax liens, in exchange for payment of the value of the government's interest in the property, and issued certifi-

cates of discharge, recorded June 22, 2006. (Doc. 48, PX 38.)

On Nov. 8, 2005, the IRS recorded an NFTL regarding Long's 2004 income tax liabilities. (Doc. 48, PX 39.)

Shortly thereafter, Long made an offer in compromise to the IRS regarding his unpaid income tax liabilities for the 1993, 1994, 1995, 2002, and 2004 tax years. Long stated that "he is unable to pay the amount in full and is offering $20,000." (Doc. 48, PX 40, Offer in Compromise, dated Nov. 25, 2005, at 2.) Long also stated:

> Taxpayer is 50% owner of the home he and his fiancee purchased together; therefore, only 50% of the available equity belongs to the taxpayer.

> There is a tax lien against the taxpayer's fiancee's condo; however, the taxpayer will need the lien to be lifted long enough for the taxpayer to liquidate all equity in the condo in order to pay the offer amount.

(Doc. 48, PX 40, at 3.)

In the "Collection Information Statement" signed on the same date, Long responded that, on Nov. 15, 2000, he had transferred the Condo out of his name, to Puruczky for less than its actual value. (Doc. 48, PX 41, § 17e.) Under the "Real Estate" section, in response to "List all the real estate you own," Long listed the East Heisley Property, and nothing else. (Doc. 48, PX 41, at § 20.)

The government asserts that the IRS rejected Long's November 2005 Offer in Compromise. (Doc. 48, at 7.)

### I. 2009 Mortgage of East Heisley Property

On Feb. 22, 2007, the 2002 mortgage (for $154,100) on the East Heisley Property was assigned to defendant Wells Fargo Bank. (Doc. 48, PX 42.)

In November 2009, Long and Puruczky jointly applied for another mortgage on the East Heisley Property, in the amount of $109,321. The residential loan application, which they both signed on Nov. 23, 2009, named Long as "borrower" and Puruczky as "co-borrower." (Doc. 48, PX 43.) That same day, Long and Puruczky jointly executed an "Borrower's Title Affidavit," swearing that they were jointly the sole owners of the East Heisley Property. (Doc. 48, PX 44.) The commitment for title insurance also identified Long and Puruczky as the joint owners. (Doc. 48, PX 45.)

The resulting mortgage of Nov. 23, 2009, on the East Heisley Property lists both Long and Puruczky as the borrowers of a principal sum of $109,321, and was signed by both Long and Puruczky. (Doc. 48, PX 46.)

The settlement statement shows that $109,321 went to Wells Fargo to pay off the earlier (2002) mortgage. (Doc. 48, PX 47.) Wells Fargo filed a Satisfaction of Mortgage dated Dec. 17, 2009, indicating that the 2002 mortgage of $154,1000 was satisfied in full. (Doc. 48, PX 48.)

Both Long and Puruczky admit that Long made payments toward this 2009 Mortgage. (Doc. 48, PX 6, Adm. No. 7; doc. 48, PX 7, Adm. No. 7; see also doc. 48, PX 49, 50.) The government asserts that Long has made payments totaling over $52,000 toward to the 2002 and 2009 mortgages. (Doc. 48, at 9, citing doc. 48, PX 49, 50, 51.)

### J. Other Payments for, and Use of, East Heisley Property

The government points out that Long has made some property tax payments for the East Heisley Property, as well as payments toward property insurance. (Doc. 48, PX 6, Adm. No. 8–9; doc. 48, PX 7, Adm. No. 8–9.)

Long has paid utility bills for the East Heisley Property, and recent 2013 electric, water, telephone, and cable bills are in his name. (Doc. 48, PX 6, Adm. No. 10; doc. 48, PX 7, Adm. No. 10; and PX 53.)

Since November 2000, Long has held himself out to others as a co-owner of the East Heisley Property. (Doc. 48, PX 6, Adm. No. 19; see also doc. 48, PX 40, at 3; PX 41, at ¶¶ 5, 20a.)

Long has continuously resided at the East Heisley Property since 2000, other than his time in prison, and has not paid any rent to Puruczky. (Doc. 48, PX 6, Adm. No. 22, 26; doc. 48, PX 7, Adm. No. 20, 23.) Puruczky has not limited Long's "use or enjoyment" of the property during that time. (Doc. 48, PX 6, Adm. No. 25; doc. 48, PX 7, Adm. No. 22.)

### III. OTHER CLAIMS ON THE EAST HEISLEY PROPERTY

The plaintiff USA summarizes the claims of other parties as follows:

— Defendant State of Ohio, Department of Taxation, asserts liens against the East Heisley Property based on notices filed against Long on Apr. 19, 2005, and Oct. 11, 2005. (Doc. 15.)

— Defendant Huntington National Bank claims an interest in the East Heisley Property based on a judgment obtained against Long in 2007. (Doc. 13.)

— Defendant Capital One Bank claims an interest in the East Heisley Property based on a judgment obtained against Long in 2009. (Doc. 11.)

— Defendant Wells Fargo claims an interest in the East Heisley Property based on the 2009 mortgage, which is "a valid first mortgage lien" upon the Property. (Doc. 42.) Wells Fargo asserts it is "entitled to first lien position on the subject property pursuant to the doctrines of equitable subrogation and/or equitable restoration." *Id.* at 2.

### IV. MOTIONS TO INCORPORATE

The two individual defendants, Long and Puruczky, have filed motions to incorporate by reference the briefing by defendant Wells Fargo on the two motions for summary judgment. (Doc. 54, 50.) The United States opposes these motions to incorporate. (Doc. 56, 59.)

Long and Puruczky urge the court to grant their motions to incorporate as a matter of judicial economy, because they state there is no need for them to file duplicative motions and responses. (Doc. 54, at 2; doc. 50, at 2.)

#### A. United States' Motion

Regarding the United States' motion for summary judgment, defendants Long and Puruczky would rely on Wells Fargo's arguments that "(1) Defendant Long did not fraudulently transfer his interest in the Heisley Property to Defendant Puruczky; and (2) even if Ohio recognized the nominee theory, Defendant Puruczky is not the nominee of Defendant Long." (Doc. 54, at 1.)

The United States also moved for summary judgment on its claim that "defendant Gerald C. Long is liable to the United States for federal income taxes, penalties, and interest for the years 2002 and 2004 in the amount of $100,336.23 as of August 5, 2013, plus statutory additions from and after that date until fully paid." (Doc. 48, at 1; see also doc. 1, complaint, at ¶ 14, and p. 6.) Wells Fargo, in its opposition, did not contest that Long is liable for these tax-related liabilities, see generally doc. 53, thus defendant Long would apparently concede that claim, and the amounts alleged to be due.

### B. Wells Fargo's Motion

As to Wells Fargo's motion, defendants Long and Puruczky would rely on Wells Fargo's arguments that:

(1) Plaintiff's liens do not attach to the subject property because Defendant Gerald Long had no legal or equitable interest in the Heisley property after 2000; (2) Plaintiff cannot enforce a lien against Defendant Eleanor Puruczky as a 'nominee,' 'alter ego,' or via a 'fraudulent conveyance,'; and (3) Plaintiff cannot prevail on a nominee theory because Ohio law does not recognize the nominee theory. Moreover, even if Ohio law did recognize a nominee theory—which it does not—Eleanor Puruczky is not the nominee of Defendant Gerald Long.

(Doc. 50, at 1–2.)

In opposition to these two motions, the United States argues that a motion to incorporate another party's brief is improper. (Doc. 59, at 1.) In support, the plaintiff cites *William D. Mundinger Trust U/A 10/13/00 v. Zellers*, which commented in a footnote:

> . . . such practice of incorporating another parties' brief for both argument and evidence as substitute for one's own fails to satisfy movant's own obligation to meet its burdens of proof and the Court admonishes counsel to refrain from such practice in the future.

*William D. Mundinger Trust U/A 10/13/00 v. Zellers*, 473 B.R. 222, 227 n. 2 (N.D.Ohio 2012). The Mundinger Trust court did not rule that the motion to incorporate was "improper," merely that it was ill-advised.

Defendants Long and Puruczky have counsel from a major, well-established law firm. The court will assume that the deci-

sion to rely on another party's briefing was duly considered, and will GRANT the motions to incorporate (doc. 50, 54.)

## V. WELLS FARGO'S MOTION FOR SUMMARY JUDGMENT

The court will address defendant Wells Fargo's motion for summary judgment (doc. 49) first. As noted earlier, the government has filed a memorandum in opposition (doc. 55), as has defendant State of Ohio, Department of Taxation (doc. 51), and Wells Fargo has filed a reply brief in support (doc. 57).

### A. Enforcement of Tax Liens

Wells Fargo's motion is primarily focused on the issue of lien priority on the East Heisley Property. See, e.g., doc. 49, at 1. Wells Fargo argues that the government's liens do not attach to the East Heisley Property. Wells Fargo contends that Long had no legal or equitable interest in the East Heisley Property after 2000. (Doc. 49, at 8–9.) Additionally, it is argued that the government cannot enforce a lien against Puruczky as a "nominee," "alter ego," or via a fraudulent conveyance.[2] (Doc. 49, at 9–14.)

The court notes, first, that the scope of 26 U.S.C. § 6321 "is broad and reveals . . . that Congress meant to reach every interest in property that a taxpayer might have". *United States v. Comparato*, 22 F.3d 455, 457 (2d Cir.1994), cert. denied, 513 U.S. 986, 115 S.Ct. 481, 130 L.Ed.2d 394 (1994) (quoting *United States v. National Bank of Commerce*, 472 U.S. 713, 719, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985).) The court must initially look "to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to

---

**2.** The government points out that it has not alleged in the Complaint that Puruczky was

the "alter ego" of Long. (doc. 55, at 1 n. 1.)

determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *United States v. Craft*, 535 U.S. 274, 278, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (quoting *Drye v. United States*, 528 U.S. 49, 58, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999)). However, once (or, if) the court determines that state law creates property interests sufficient for a federal tax lien to attach, "state law is 'inoperative to prevent the attachment' of such liens." *Paternoster v. United States*, 640 F.Supp.2d 983, 989 (S.D.Ohio 2009) (quoting *United States v. Rodgers*, 461 U.S. 677, 683, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983)).

The Supreme Court has advised, in other words:

> In looking to state law, we must be careful to consider the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them. Such state law labels are irrelevant to the federal question of which bundles of rights constitute property that may be attached by a federal tax lien.

*Craft*, 535 U.S. at 279, 122 S.Ct. 1414.

Wells Fargo first asserts that, "after execution and delivery of the Quit–Claim Deed in October 2000, Defendant Gerald Long had no actionable interest in the subject property." (Doc. 49, at 9, citing doc. 49, DX H; see also doc. 48, PX 16.) Thus, the government's liens filed in 2005 and 2006 do not attach to the East Heisley Property, and are not enforceable in this action. (Doc. 49, at 9.)

The government responds that Puruczky holds title to the East Heisley Property as Long's nominee (doc. 55, at 9–13), and also that Long's transfer of his interest in the Property was fraudulent (doc. 55, at 13–16).

### 1. Ohio Law and Nominee Theory

Wells Fargo maintains that Ohio law does not recognize the nominee theory of ownership, and therefore the liens against the East Heisley Property cannot be based on that theory to establish a property interest on behalf of Long. (Doc. 49, at 10, citing cases.) The government responds that the "great weight of authority holds that the United States may enforce federal tax liens against property that is held in the name of the taxpayer's nominee." (Doc. 55, at 3, citing cases.) The government points to federal cases in Ohio where the nominee doctrine has been applied in this context. *Id.*

The parties do not point to any decision of the Supreme Court of Ohio on this issue, and the Sixth Circuit has not directly addressed the status of the nominee doctrine under Ohio law. Although the government cites several Sixth Circuit cases, none actually address the issue head on, as to Ohio law. See doc. 55, at 3, citing cases.

For example, *Spotts v. United States*, cited by both parties, is an influential case in the application of the nominee theory, *Spotts v. United States*, 429 F.3d 248 (6th Cir.2005). Spotts points out that a federal tax lien does not attach to property in which a person has no interest under state law. *Spotts*, 429 F.3d at 251 (citing *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985)). "Thus, before determining what, if any, federal tax consequences attach, we must first address the pertinent questions of state property law." *Spotts*, 429 F.3d at 251. Kentucky law was involved in Spotts, and thus, as to the nominee theory under Ohio law, Spotts is not helpful at this point.

In *United States v. O'Brien*, a pro se Ohio resident appealed an adverse award of summary judgment in his action "to

reduce a tax assessment to judgment and foreclose on real property owned by O'Brien but titled in the name of a nominee." *United States v. O'Brien*, 229 F.3d 1154, 2000 WL 1175278, at *1 (6th Cir. 2000) (TABLE, text in WESTLAW). However, in his appeal, "O'Brien has chosen to raise only frivolous tax protestor arguments that he is not subject to the jurisdiction of the United States, is not a taxpayer, and is not liable for any tax." *Id.* The court did not have occasion to address [3] the status of the nominee theory under Ohio law.

*PBV, Inc. v. Rossotti* involved an appeal of the district court's refusal to grant a preliminary injunction against an IRS levy. *PBV, Inc. v. Rossotti*, 178 F.3d 1295, 1999 WL 220123, at *1 (6th Cir.1999) (TABLE, text in WESTLAW) (per curiam). The case arose out of a lien and levy placed by the IRS for unpaid taxes of one corporation on the theory that PBV was "the transferee, alter ego, or nominee" of that corporation. *Id.* The court stated that "[t]he IRS may collect a taxpayer's unpaid taxes from the assets of the taxpayer's nominee, instrumentality, or alter ego." *PBV*, 1999 WL 220123, at *2 (citing *Lemaster v. United States*, 891 F.2d 115, 119 (6th Cir.1989)).

The court in PBV recognized that "federal courts apply the law of the forum state to resolve alter ego and similar questions." *PBV*, 1999 WL 220123, at *2. The Sixth Circuit in PBV apparently did not find Ohio law supporting a nominee theory, because the court went on to rule: "Because there is no Ohio law on nominee ownership, the factors used by other courts can be applied." *PBV*, 1999 WL 220123, at *2.

Finally, *Lemaster v. United States* involved an appeal from an award of sanctions against plaintiffs and their counsel. *Lemaster v. United States*, 891 F.2d 115, 116 (6th Cir.1989) (per curiam). The suit had been filed after the IRS seized property ostensibly owned by the son of the taxpayers, to pay the tax liabilities owed by his parents. *Id.* The case proceed to a bench trial, and the court ruled in favor of the government, finding that "[the son's] ownership of the property was undoubtedly a 'sham' designed to insulate assets from the reach of [the parents'] creditors." *Id.* at 118.

As to the issue currently before this court, the Sixth Circuit ruled:

> In dealing with the reasonableness of [plaintiffs'] actions, assuming that the government acted to pursue funds from an alter ego under section 6331, plaintiffs attempt to claim that their challenge to the government's actions was reasonable because, at the time the suit was filed the legality of seizures from nominees without pre-seizure hearings was uncertain. We disagree. The Supreme Court resolved the alter ego seizure question, in the government's favor, in *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977). The tactic of proceeding against the nominee of a taxpayer for the purpose of satisfying the taxpayer's tax obligations had also been upheld by post-G.M. Leasing circuit court decisions. *Loving Saviour Church v. United States*, 728 F.2d 1085 (8th Cir.1984); *Valley Finance, Inc. v. United States*, 629 F.2d 162, 171–73 (D.C.Cir.1980), cert. denied, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981). Given these facts, it was unreasonable to be-

---

**3.** The court of appeals generally does not discuss legal matters not raised by the appellant's brief. See generally *Lewis v. City of* *Grand Rapids*, 356 F.2d 276, 278 (6th Cir. 1966); *General Elec. Co. v. Sciaky Bros., Inc.*, 304 F.2d 724, 727 (6th Cir.1962).

lieve that doubt existed as to the legality of the government's theory.

*Lemaster,* 891 F.2d at 119.

It is unclear from the appellate decision in Lemaster whether the trial court's finding of a "sham" had been the result of applying an "alter ego" theory, or a nominee theory, or both. The facts would seem to support an "alter ego" approach to corporate ownership, because all of the property and assets of the trucking business were in the son's name, while the father controlled all aspects of the company's day-to-day business. *Lemaster,* 891 F.2d at 117; see, e.g., *In re Fisher,* No. 07–3319, 2008 WL 4569946, at *9 (6th Cir. Oct. 10, 2008) (Ohio's alter ego doctrine). In any event, as noted, supra, the government here is not relying on the theory that Puruczky was the "alter ego" of Long. (doc. 55, at 1 n. 1.) When addressing the nominee issue specifically, the Lemaster court does not rely on Ohio (or even Sixth Circuit) law. *Lemaster,* 891 F.2d at 119.

None of these Sixth Circuit cases, then, directly addresses the status of the nominee theory under Ohio law. Kentucky law was involved in Spotts, O'Brien did not have occasion to address the nominee theory, PBV found no Ohio law on nominee ownership, and Lemaster relied on non-Ohio cases.

In the district courts, there has been a lack of consensus among those courts which have addressed the issue. See, e.g., *Nantucket Vill. Dev. Co. v. United States,* No. 5:99CV230, 2001 WL 169316, at *5 (N.D.Ohio Jan. 9, 2001) ("split among the district courts of Ohio regarding whether Ohio law recognizes the nominee theory"). Several cases cited by the parties are instructive.

### a. Nantucket Village

In *Nantucket Vill. Dev. Co. v. United States,* this court addressed a motion for judgment on the pleadings which argued that a nominee cause of action was not recognized under Ohio law. *Nantucket Vill. Dev. Co. v. United States,* No. 5:99CV230, 2001 WL 169316, at *3 (N.D.Ohio Jan. 9, 2001) (Gaughan, J.). The court recognized there was a split among the district courts of Ohio on this issue, and examined several cases discussing the nominee theory. *Nantucket Village,* 2001 WL 169316, at *5–*8. The court found that Ohio clearly recognizes the concept of equitable ownership which is, essentially, a recognition of the nominee doctrine by another name. *Id.* at *8–*9. The court pointed out that the label used by state law is unimportant, so long as the underlying property rights are the same. *Id.* at *8.

The court in Nantucket Village defined an equitable owner as

... recognized in equity as the owner of property, because the real and beneficial use and title belong to him, although the bare legal title is vested in another ... There may therefore be two "owners" in respect of the same property, one the nominal or legal owner, the other the beneficial or equitable owner.

*Nantucket Village,* 2001 WL 169316, at *9 (quoting *Flint v. Holbrook,* 80 Ohio App.3d 21, 608 N.E.2d 809, 814 (Ohio Ct.App. 1992)). The court went on to state:

Under Ohio law, one who makes out-of-pocket expenditures to complete repairs to property, pays utility expenses and shares responsibility for monthly mortgage payments may hold an equitable interest in the property, despite the fact that another holds the title.

*Nantucket Village,* 2001 WL 169316, at *9 (citing *Ohio Div. of Real Estate v. Vantell,* 128 Ohio App.3d 410, 715 N.E.2d 217, 222 (Ohio Ct.App.1998)).

The court ruled that the greater weight of federal authority and Ohio law indicated

that the government could bring a cause of action against the movant-defendants as nominees of the tax-debtor, and thus the federal tax liens on their property were properly imposed at the time of the tax assessments. The Rule 12 motion for judgment was denied. Nantucket Village, 2001 WL 169316, at *11.

### b. Smith

In *United States v. Smith*, the government sought to foreclose on federal tax liens on two parcels of real property. *United States v. Smith*, No. 1:99CV974, 2008 WL 4960430 (S.D.Ohio Nov. 19, 2008) (Hogan, M.J.). After a bench trial, the court found that the defendant's transfer of title to his parents was fraudulent under Ohio law, and that the government was entitled to foreclose on the property, and to apply the proceeds to the defendant's income tax liability. *Smith*, 2008 WL 4960430, at *10.

In the alternative, the court in Smith found that the government would be entitled to foreclose on the property because the titular owners were not the true beneficial owners of the property, rather, they were nominees of the defendant. *Smith*, 2008 WL 4960430, at *11–*12. The court stated that the government may collect a taxpayer's unpaid tax from the taxpayer's nominee(s). *Id.* at *11. The court ruled that, to the extent that Ohio law does not explicitly recognize the nominee theory of ownership, it does recognize "equitable ownership," which is akin to the nominee theory. *Smith*, 2008 WL 4960430, at *11 (citing *Spotts*, 429 F.3d at 253 n. 2, and other cases). The court found that the titular owners did not pay adequate consideration for the property, that the transfer was made at a time when the defendant knew that he was facing substantial income tax liabilities, and that he retained virtually total control of the property. *Id.*

at *12. The court found the titular owners (defendant's mother and brother) were mere nominees of the defendant, and that the government was entitled to judgment, and that the property was to be foreclosed and sold, with the proceeds to be applied against defendant's income tax liabilities. *Id.*

### c. Gaumer

In *United States v. Gaumer*, this court denied a motion to dismiss allegations that a Land Trust was the nominee of a taxpayer subject to tax liens. In denying the motion, the court found that, although Ohio law does not explicitly recognize a "nominee theory" of ownership, it does recognize "equitable ownership," which is akin to the nominee theory. *United States v. Gaumer*, No. 4:07CV1352, 2007 WL 4365399, at *3 (N.D.Ohio Dec. 10, 2007) (Economus, J.). The court's finding was in accord with the Supreme Court's guidance that a federal court "consider the substance of the rights state law provides, not merely the labels the State gives these rights." See *Craft*, 535 U.S. at 279, 122 S.Ct. 1414.

### d. Toler

In *United States v. Toler*, the court ruled on motions for summary judgment on the issue of whether the government could foreclose on several parcels of real estate to enforce to federal tax liens. *United States v. Toler*, 666 F.Supp.2d 872, 882 (S.D.Ohio 2009) (Marbley, J.). The court pointed out that a federal tax lien does not arise to a right in property when the person has no property interest under the laws of the state. *Toler*, 666 F.Supp.2d at 883 (citing *Spotts*, 429 F.3d at 251). The government argued that the tax-debtors could be found to have an interest in the property at issue under a

nominee theory.[4]

Toler stated that the nominee theory allows recovery from a debtor "where there seems to be a relationship between a debtor and an asset such that there is a concealed understanding between the debtor and the nominal owner that one is holding legal title for the other." *Toler,* 666 F.Supp.2d at 883. The government here points out that, although many nominee cases involve concealment, "the fundamental question in determining whether a federal tax lien attaches is who is in control of a property, regardless of whether that control is concealed or not." (Doc. 55, at 7, citing *Craft,* 535 U.S. at 283, 122 S.Ct. 1414; see also *Nantucket Village,* 2001 WL 169316, at *9.)

However, the court in Toler determined that "nominee theory is not recognized under Ohio law." *Toler,* 666 F.Supp.2d at 883. In addition, the court found that equitable ownership [5] was not synonymous with nominee doctrine. *Id.* at 884. Thus, having found that Ohio law does not recognize the nominee theory, the court found that the government could not proceed with foreclosure on the tax liens based on that theory. *Id.* at 885.

### e. Billheimer

In *United States v. Billheimer,* the court stated:

> Where an individual is only the nominal owner of land, i.e., the nominee of another who is the de facto or true owner, and where that true owner is also the Government's debtor, the Government may attach such property held in the nominee's name to satisfy the debt owed it by the true owner.

*United States v. Billheimer,* 197 F.Supp.2d 1051, 1059 (S.D.Ohio 2002) (citing *Lemaster,* 891 F.2d at 119; *PBV,* 1999 WL 220123, at *2). The court noted that whether the debtor had a property interest in the property which the government seeks to attach is a question of state law, and that the Sixth Circuit had found that "no law has developed in Ohio with respect to nominee ownership." *Billheimer,* 197 F.Supp.2d at 1059. However, the court found that "where suspected nominal ownership stems from a transfer of property, the Court's inquiry looks much the same as that undertaken on the question of whether a transfer was fraudulently made." *Billheimer,* 197 F.Supp.2d at 1060.

### f. Dusterberg

In *United States v. Dusterberg,* the court stated that "federal courts recognize the nominee doctrine as a part of Ohio law." *United States v. Dusterberg,* No. C–2–95–976, 1997 WL 327395, at *2 (S.D.Ohio Mar. 12, 1997). The court said that nominee doctrine "will set aside a purported conveyance if the assignee of the property is merely the titular, and not the factual, owner of the property." *Id.*

In ruling on a motion to dismiss, the court found:

> ... the United States has alleged facts that are sufficient to state a claim concerning whether [defendant-wife] was [defendant-husband]'s nominee for [husband]'s interest in the property. According to the United States's complaint, [the husband] gave his portion of the property to [the wife] without consideration. Moreover, [the husband] never re-

---

4. The government had also argued fraudulent conveyance.

5. The government here points out that the concept of equitable ownership is not limited to the circumstances discussed in *Toler.* (Doc. 55, at 7–8, citing, e.g., *State v. Heap,* No. C–040007, 2004 WL 2480703, at *4 (Ohio Ct.App. Nov. 5, 2004).)

linquished possession of the property; in fact, he continued to pay the property's taxes, utilities, and other expenses. *Dusterberg*, 1997 WL 327395, at *3. The court denied the motion to dismiss allegations which were based on a nominee theory.

### g. Summary

■ The parties do not point to a Supreme Court of Ohio decision which has spoken to the application of the nominee theory, either pro or con. Reviewing the decisions of federal courts in Ohio, as discussed above, this court agrees with the decision in Nantucket Village, that the greater weight of federal authority in Ohio indicates that the government can bring a cause of action against a nominee of a tax-debtor, and thus federal tax liens on the property can be imposed. *Nantucket Village*, 2001 WL 169316, at *11. While the decisions have been varied in finding support for the validity of the application of the nominee theory, the common theme has been a consideration of "the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them." *Craft*, 535 U.S. at 279, 122 S.Ct. 1414; see also *Nantucket Village*, 2001 WL 169316, at *8; *May v. A Parcel of Land*, 458 F.Supp.2d 1324, 1337 n. 22 (S.D.Ala.2006), aff'd 2007 WL 3287513 (11th Cir. Nov. 8, 2007).

### 2. Application of Nominee Theory

Wells Fargo argues that, even if Ohio law recognized the nominee theory, Puruczky is not the nominee of Long. (doc. 49, at 10–12.)

A nominee theory involves the determination of the true beneficial ownership of property. *Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir.2000); *May*, 458 F.Supp.2d at 1339. The parties

agree that, if the nominee theory is available, the court should apply the six-factor test from Spotts in determining whether Puruczky holds title to the East Heisley Property as Long's nominee. (Doc. 49, at 11; doc. 55, at 9.)

■ The six factors set forth in Spotts are:

(1) whether inadequate or no consideration was paid by the nominee;

(2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property;

(3) whether there is a close relationship between the nominee and the transferor;

(4) whether they failed to record the conveyance;

(5) whether the transferor retained possession; and

(6) whether the transferor continues to enjoy the benefits of the transferred property.

*Spotts*, 429 F.3d at 253 n. 2; see also *Oxford Capital*, 211 F.3d at 284.

■ Courts have also looked at factors such as, "whether the taxpayer held himself out as the owner of the property, whether the taxpayer pays real estate taxes and other maintenance charges, and whether the taxpayer pays the fair rental value of the property." *United States v. Northern States Investments, Inc.*, 670 F.Supp.2d 778, 789 (N.D.Ill.2009); see also *May*, 458 F.Supp.2d at 1339–1340. The ultimate inquiry is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership. *Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir.2007).

■ As to the applicability of the Spotts factors, the Sixth Circuit noted:

The factors used by courts to determine nominee status are most enlightening when the alleged nominee and the alleged true beneficial owner have the type of relationship where both individuals would not normally be expected to simultaneously act as true owners. The factors are less probative in the context of a home purchase by a married couple because even if the home is only titled in one name, both ordinarily act as true owners.

*Spotts,* 429 F.3d at 253 n. 2. Long and Puruczky met in 1999, moved in together in summer of 2000, and apparently have lived together since. See, e.g., doc. 49, DX A, Puruczky aff., ¶¶ 6, 9, 42–44. The parties do not dispute that, despite being unmarried, Long and Puruczky have had a long term relationship[6]. Given their status, it is difficult for the court to determine whether they have "the type of relationship where both individuals [would or] would not normally be expected to simultaneously act as true owners." *Spotts,* 429 F.3d at 253 n. 2. Some unmarried cohabitating couples share title to their residence, while others do not. Puruczky avers, for example, that she expected that title to the East Heisley Property would be solely in her name. See doc. 49, DX A, ¶ 23.

In any event, the parties do not dispute that Long and Puruczky have a close relationship (third factor). In addition, the conveyance was recorded (fourth factor), and the transferor (Long) retained residence at the East Heisley Property (fifth factor), and continues to enjoy the benefits of the transferred property (sixth factor).

The dispute, then, would appear to center on the first two factors. As to the adequacy of consideration, Wells Fargo argues:

... Eleanor Puruczky contributed well over $95,000 of the down-payment for the [East] Heisley Property under circumstances where (a) it was Eleanor Puruczky's intent and understanding that she alone was supposed to be in title, (b) the Quit–Claim Deed was executed within twenty-four hours of the closing; (c) Eleanor Puruczky has both been personally liable for three (3) separate mortgage-loans for the subject property; and (d) Defendant Long and Ms. Puruczky have split living expenses for the last fourteen years.

(Doc. 49, at 11–12, citing doc. 49, DX A, Puruczky aff., ¶¶ 17–19, 22–25, 42–45.) Wells Fargo contends that Long was "never intended to have a fee interest" in the East Heisley Property. (Doc. 49, at 12; see also doc. 49, DX A, ¶ 23.)

The plaintiff United States responds that it is undisputed that Puruczky did not pay cash (or its equivalent) to Long in exchange for the transfer of his 50% interest in the East Heisley Property, as reflected in the Nov. 4, 2000, deed. The government contends that the defendants' contention that Puruczky contributed "well over $95,000 of the down-payment" concerns the earlier transaction, the Oct. 6, 2000, deed. The government argues that it is the later (November) transaction which is relevant for purposes of the analysis of whether the consideration was adequate. In the government's view, con-

---

**6.** Ohio prohibits recognition of in-state "common law marriages," formed after 1991. Ohio Rev.Code § 3105.12. Long and Puruczky began dating in 1999, but apparently have chosen not to enter into a marriage relationship, which is certainly their option; however, Ohio law does not recognize a separate legal status for cohabitating unmarried persons. See, e.g., *Williams v. Ormsby,* 131 Ohio St.3d 427, 966 N.E.2d 255 (2012); *Tarry v. Stewart,* 98 Ohio App.3d 533, 541–542, 649 N.E.2d 1, 6 (Ohio Ct.App.1994); *Lauper v. Harold,* 23 Ohio App.3d 168, 170, 492 N.E.2d 472, 474 (Ohio Ct.App.1985).

siteration that may have been paid by Puruczky on Long's behalf in the earlier transaction should not factor into the analysis of the sufficiency of consideration in the second transaction. (Doc. 55, at 9, citing *United States v. Sweeny,* 418 F.Supp.2d 492, 497 (S.D.N.Y.2006).)

In *United States v. Sweeny,* the court rejected an argument that past consideration was sufficient consideration, where a tax-debtor's property was transferred to his son "in exchange for his payment of carrying costs in the past and his assumption of any future payments." *Sweeny,* 418 F.Supp.2d at 497. The issue in Sweeny was whether the son was a "purchaser," who, for adequate consideration, had acquired an interest valid against subsequent purchasers, or, in that case, a tax lien against the purported seller. *Id.* The court found that past consideration was insufficient to render the son a "purchaser" under the statute, 26 U.S.C. § 6323(h)(6). *Sweeny,* 418 F.Supp.2d at 497–498.

The government also argues that Long and Puruczky both contributed evenly to the purchase of the East Heisley Property:

> In the purchase agreement, they committed to pay a total of $253,450.00 via a $5,000.00 earnest money deposit, a $95,000.00 escrow payment, and a $153,450.00 mortgage. [Doc. 48, PX 1, signed by Long and Puruczky, Oct. 4, 2000.] They jointly paid the $5,000.00 deposit via a promissory note that was in both of their names. [Doc. 48, PX 2, signed Oct. 4, 2000.] They jointly entered into the mortgage in both of their names as well. [Doc. 48, PX 10, signed Nov. 1, 2000.] They obtained the remaining funds for the down payment from a home equity line of credit with Fifth Third Bank dated October 20, 2000, established in both of their names, in the amount of $140,000.00, and se-

cured by the real property located at 498 Jeannette Drive, Richmond Heights, Ohio 44143 ("the Jeannette Property"). [Doc. 48, PX 11, dated Oct. 20, 2000.] (Doc. 55, at 10.)

The government contends that, although Puruczky was the owner of the Jeannette Property, and paid off the line of credit with the proceeds of the sale of that property, Puruczky admittedly could not obtain financing on her own, and needed Long to co-sign on the line of credit. In the government's view, then, it is wrong "to say that Ms. Puruczky made the bulk of the down payment by herself, when, in reality, she could not have made the payment without Mr. Long being her co-debtor." (Doc. 55, at 10.) The government also points out that Long transferred the Village Green Condominium to Puruczky by deed of Nov. 3, 2000, thus although she provided partial funding for the East Heisley Property by the sale of the Jeannette Property, she was compensated by the simultaneous gift of the Condo. *Id.* The court finds the government has raised a genuine issue as to this argument.

As to Wells Fargo's contention that Long was "never intended to have a fee interest" in the East Heisley Property (doc. 49, at 12), that relies on assertions by Puruczky and real estate agent Jim Wetzel that Long's name was mistakenly placed on the deed. (Doc. 49, DX A, Puruczky aff., ¶¶ 22–24, and doc. 22, DX 5, Wetzel decl., ¶¶ 5–6.) Wetzel declares that, at the time of the sale, Long and Puruczky "intended the title to the home to be in Eleanor's name." As argued by the plaintiff, Wetzel's declaration would fall short of Rule 56's standards that it must be made on personal knowledge, set out facts admissible in evidence, and show the declarant is competent to testify on the matter stated. (Doc. 55, at 13, citing Fed.R.Civ.P. 56(c) (4).) The court agrees with the gov-

ernment that Wetzel's assertions as to Long and Puruczky's intentions in this regard would not be admissible. As to Puruczky's statement that it was her "intention and understanding" that title would be solely in her name (doc. 49, DX A, Puruczky aff., ¶ 23), that is an issue of credibility, rather than "fact," to be considered by the factfinder. See, e.g., *Ahlers v. Schebil,* 188 F.3d 365, 369 (6th Cir.1999) (credibility judgments prohibited on summary judgment); see also *Seamons v. Snow,* 206 F.3d 1021, 1027–1028 (10th Cir.2000) (question of intent).

The government points out that the documentary trail provides evidence to the contrary: The Purchase Agreement defined the "purchaser" as "the undersigned Gerald C. Long & Eleanor L. Puruczky," and states that "Seller shall convey a good and marketable title to Purchaser by a general warranty deed." (Doc. 48, PX 1, ¶¶ 1, 7.) On the mortgage loan application, it is stated, in response to the box, "Title will be held in what Name(s)," "Gerald C. Long & Eleanor L. Puruczky" was filled in. (Doc. 48, PX 9.) In the mortgage instrument, the "Borrower [signed below as Long and Puruczky] covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property ..." (Doc. 48, PX 10.) These documents would seem to indicate that placing both Long and Puruczky on the deed was not a mistake. Nevertheless, as previously stated, the court does not reach the question of "mistake" at this time. *Ahlers,* 188 F.3d at 369. The court finds a genuine issue in this argument.

The government asserts that Wells Fargo does not address the second factor ("whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property") in its motion for summary judgment, but the "undisputed facts of record show that shortly after the transfer, Mr. Long was charged with, and pled guilty to, tax crimes that resulted in his owing hundreds of thousands of dollars in federal income taxes." (Doc. 55, at 11.) Because the movant does not raise the second factor in the motion, doc. 49, at 10–12, the court does not address it here.

As stated earlier, the court is required to construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the government as non-movant. In light of the conflicting evidence reviewed above, the court finds that Wells Fargo has not met its burden of showing "the absence of a genuine issue of material fact" regarding Puruczky's status as a nominee for Long's ownership interest in the East Heisley Property. Wells Fargo's motion for summary judgment is denied, as to this issue.

### 3. Fraudulent Conveyance

Wells Fargo also argues that the Quit–Claim Deed of Long's half-interest to Puruczky was not a fraudulent conveyance. (Doc. 49, at 13.)

The Ohio statutory elements to demonstrate fraudulent conveyance are fairly straightforward: "(1) a conveyance or incurring of a debt; (2) made with actual intent to defraud, hinder, or delay; (3) present or future creditors." *Blood v. Nofzinger,* 162 Ohio App.3d 545, 557, 834 N.E.2d 358, 367 (Ohio Ct.App.2005) (citing R.C. 1336.04(A)(1)).

While the government has the ultimate burden of proving the debtor's intent, "Ohio has recognized that proof of actual intent will often be impossible to procure. Thus, direct evidence of fraudulent intent is not essential. A creditor may still establish a debtor's actual fraudulent intent if the circumstances demon-

strate 'badges of fraud.' " *Blood,* 162 Ohio App.3d at 557–558, 834 N.E.2d at 367–368.

The parties agree that the analysis is governed by the badges of fraud set out in Ohio Rev.Code § 1336.04(B). (Doc. 49, at 13–14; doc. 55, at 13.) Wells Fargo presents the following as relevant:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

\* \* \*

(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

\* \*

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

(Doc. 49, at 13–14, quoting Ohio Rev.Code § 1336.04(B).)

Wells Fargo contends that the plaintiff "cannot establish any of the badges of fraud." (Doc. 49, at 14.) The entire argument put forward as to these contested factors is:

At the time of the conveyance via the Quit–Claim Deed in October, 2000, Defendant Long had no more than 'a couple thousand dollars' in equity in the property. The assessments about which the Plaintiff complains were not incurred until 2002 and 2004 under circumstances where there is no evidence to suggest that Eleanor Puruczky knew anything about Defendant Long's issues with the IRS or that Plaintiff may attempt to assert a tax lien against her interest. Simply stated, Defendant Gerald Long's conveyance of his ½ interest in the Heisley Property was not a fraudulent conveyance.

(Doc. 49, at 14.)

Although Wells Fargo sets forth what it considers to be the relevant "badges of fraud," its motion does not identify which of these badges the plaintiff is arguably unable to meet, other than to state in a conclusory manner, that the plaintiff "cannot establish any of the badges of fraud." (Doc. 49, at 14.)

■ It is clear from the facts already discussed that the second badge would seem to be met: the debtor retained possession of the property after the transfer. The government notes that the issue of consideration and Long's equity was discussed in the nominee theory and related arguments already addressed. (Doc. 55, at 14.) As to the timing of the assessments, it is no longer required under the statute that "the allegedly fraudulent transfer occur subsequent to the creation of a debtor/creditor relationship; it permits claims for transfers made with the intent to defraud future creditors." *Blood,* 162 Ohio App.3d at 554, 834 N.E.2d at 364.

As to the assertion that there is no evidence that Puruczky knew anything about Long's issues with the IRS, the government infers that Wells Fargo is attempting to invoke the so-called safe harbor provisions, Ohio Rev.Code § 1336.08(A), which states that a "transfer ... is not fraudulent ... against a person

who took in good faith and for a reasonably equivalent value." (Doc. 55, at 14, quoting Ohio Rev.Code § 1336.08(A).)

As noted by the government, the assertion of good faith and reasonably equivalent value is an affirmative defense, on which Puruczky bears the burden of proof. (Doc. 55, at 14, citing *In re Grove–Merritt,* 406 B.R. 778, 810 (Bankr.S.D.Ohio 2009).) There are at least two problems with Wells Fargo's implied assertion of this defense. As an affirmative defense, it is not the plaintiff's burden, therefore the government need make no showing in opposition to the motion. See generally *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548 (summary judgment is entered against party who fails to make showing sufficient to establish the existence of element on which that party will bear burden of proof at trial); *Wells Fargo Bank, N.A. v. Favino,* No. 1:10 CV 571, 2011 WL 1256847, at *3–*4 (N.D.Ohio Mar. 31, 2011) (party asserting affirmative defense bears burden). Second, as pointed out by the government, the affirmative defense belongs to Puruczky[7] herself, not to Wells Fargo. See *Grove–Merritt,* 406 B.R. at 810 (transferee bears burden of proof).

Although Wells Fargo asserts that the plaintiff "cannot establish *any* of the badges of fraud" (doc. 49, at 14, emphasis added), the government has responded with support for some of the badges. (Doc. 55, at 14–15.) Generally speaking, the movant has the initial burden of showing "the absence of a genuine issue of material fact" as to a specific, essential element of the plaintiff's case. *Thomas v. Barton Lodge II, Ltd.,* 174 F.3d 636, 644

(5th Cir.1999); *Street,* 886 F.2d at 1479. The non-moving party is not required to address grounds which were not specifically raised in the motion. See, e.g., *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736 (7th Cir.2006); *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 765 (7th Cir. 2006). Here, the motion asserts that the government "cannot establish *any* of the badges of fraud" (doc. 49, at 14, emphasis added), and the government has responded (doc. 55, at 14–15) with support for finding issues of material fact regarding some of the "badges of fraud" element of the allegations of fraudulent conveyance. The court finds that Wells Fargo has not met its burden of showing "the absence of a genuine issue of material fact" on this allegation. Wells Fargo's motion for summary judgment is denied, as to this issue.

### B. Equitable Subrogation

Wells Fargo asserts also that, even if the government's NFTL attached to a half-interest in the East Heisley Property, Wells Fargo should be entitled to first lien priority, pursuant to the doctrine of equitable subrogation. (Doc. 49, at 14–20.)

Wells Fargo asserts that, as between a state law lien and a federal tax lien, the first perfected lien is entitled to priority. (Doc. 49, at 14, citing *United States v. Dishman Indep. Oil, Inc.,* 46 F.3d 523, 526 (6th Cir.1995).) Wells Fargo states that federal law provides that "where, under local law, one person is subrogated to the rights of another with respect to a lien or interest, such person shall be subrogated to such rights for purposes of any lien imposed by section 6321 or 6324." (Doc.

---

**7.** Puruczky raised the defense in her answer, see doc. 25, ¶ 27, but does not herself make any arguments in support of the defense. The government points out that, in her answer, Puruczky asserts that she "acted in good faith," but she nowhere states that she gave Long "reasonably equivalent value" for his interest in the East Heisley Property. (Doc. 55, at 15, citing doc. 25, ¶ 27, and doc. 49, DX A, Puruczky aff.; see generally *Permasteelisa CS Corp. v. Airolite Co.,* No. 2:06CV569, 2007 WL 4615779, at *8 (S.D.Ohio Dec. 31, 2007) (statute requires both elements).)

49, at 15, quoting 26 U.S.C. § 6323(i)(2).) Thus, Wells Fargo argues the court must look to Ohio law to determine whether the doctrine of equitable subrogation should apply. (Doc. 49, at 15, citing *United States v. Baran*, 996 F.2d 25, 28 (2d Cir. 1993).)

▮ The priority of a federal tax lien under 26 U.S.C. § 6321 as against liens created under state law is governed by the common law rule, "first in time, first in right." *United States v. Pioneer American Ins. Co.*, 374 U.S. 84, 87, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963) (citing *United States v. City of New Britain*, 347 U.S. 81, 85–86, 74 S.Ct. 367, 98 L.Ed. 520 (1954)). Ordinarily, under 26 U.S.C. § 6322, a federal tax lien is perfected at the time the lien is assessed.

An exception to the "first in time" rule applies under 26 U.S.C. § 6323(a) when a federal lien competes with the interest of a purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor. *United States v. American Scrap Tire Recycles, Inc.*, No. 1:07CV156, 2008 WL 1696927, at *5 (N.D.Ohio Apr. 9, 2008). When a competing lien falls into one of these limited categories, a federal tax lien is perfected at the time the government provides notice complying with the provisions of 26 U.S.C. § 6323(f). *Id.*

There is no dispute that the IRS recorded a Notice of Federal Tax Lien ("NFTL") regarding Long's 2002 income tax liabilities with the Recorder of Lake County on Dec. 26, 2003. (Doc. 48, PX 31–32.) The IRS also filed an NFTL concerning Long's 2002 tax liabilities, naming Puruczky as his nominee, specifically attaching the East Heisley Property, on Feb. 8, 2005. (Doc. 48, PX 34–35.) On Nov. 8, 2005, the IRS recorded another NFTL, regarding Long's 2004 income tax liabilities. (Doc. 48, PX 39.)

The currently existing mortgage (for a principal sum of $109,321) on the East Heisley Property, held by Wells Fargo, was signed by Long and Puruczky on Nov. 23, 2009, and recorded on Dec. 9, 2009. (Doc. 48, PX 46.) The related settlement statement shows that equivalent funds went to Wells Fargo to pay off the earlier (2002) mortgage. (Doc. 48, PX 47.) Wells Fargo claims that, in refinancing the mortgage, Wells Fargo "intended that the security for any modification [of the mortgage] would remain a first and best lien." (Doc. 49, at 6, citing DX I, ¶ 9.) Apparently, however, Wells Fargo relied on an affidavit of Long and Puruczky which assured that there were no pending liens or other encumbrances on the property.[8] (Doc. 49, at 6–7, citing DX I, ¶ 9.)

The government argues that Wells Fargo's 2009 security interest in the East Heisley Property is junior to the federal tax liens which had already attached to Long's interest in the property prior to that date. (Doc. 55, at 17–18.) The government asserts that Ohio law does not permit equitable subrogation under the circumstances of this case, "where a mortgagee negligently released its mortgage despite having intervening federal tax liens of record." (Doc. 55, at 19.)

Wells Fargo claims that it has a justified expectation of first lien position on the property, which is protected by the doctrine of equitable subrogation. (Doc. 49, at 15; doc. 57, at 6.) Wells Fargo asserts that:

> In Ohio, where one fully performs an obligation of another, secured by a mortgage, said performer becomes by subro-

**8.** Wells Fargo also refers to a Short–Form Commitment for Title Insurance, wherein the title agency inexplicably failed to note the NFTL which had been recorded on the East Heisley Property in 2005. (Doc. 49, citing DX M; *see generally* doc. 48, RX 34.)

gation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment even on account of misrepresentation, mistake or other similar imposition.

(Doc. 49, at 15, citing cases.) Wells Fargo contends that the inclusion of the phrase "of another" in 26 U.S.C. § 6323(i)(2) [as well as in the proposition of law cited above] should present no obstacle to the application of the doctrine of equitable subrogation, notwithstanding the fact that the 2009 mortgage satisfied Wells Fargo's own 2002 mortgage. (Doc. 49, at 17–18.)

The Supreme Court of Ohio recognizes equitable subrogation, which "arises by operation of law when one having a liability or right or a fiduciary relation in the premises pays a debt due by another under such circumstances that he is in equity entitled to the security or obligation held by the creditor whom he has paid." ABN AMRO Mortg. Group v. Kangah, 126 Ohio St.3d 425, 427, 934 N.E.2d 924, 926 (2010) (quoting State v. Jones, 61 Ohio St.2d 99, 102, 399 N.E.2d 1215 (1980).) The court states that "the application of equitable subrogation depends upon the facts and circumstances of each case and is largely concerned with the prevention of frauds and relief against mistakes." ABN, 126 Ohio St.3d at 428, 934 N.E.2d at 927 (citing Jones, 61 Ohio St.2d at 102, 399 N.E.2d 1215).

Wells Fargo argues that equitable subrogation should be applied in its favor, in part to prevent unjust enrichment. (Doc. 49, at 15; doc. 57, at 6.) Wells Fargo does not fully develop the "unjust enrichment" argument, but the court does not find it to be persuasive in the circumstances of this case. To establish "unjust enrichment" in Ohio, the party must demonstrate "(1) a benefit conferred upon [the other party]; (2) the [other party]'s knowledge of that benefit; and (3)

the [other party]'s retention of the benefit under circumstances when it would be unjust." Home Sales, Inc. of Delaware v. Burris, No. 10CA6, 2011 WL 2623673, at *3 (Ohio Ct.App. June 28, 2011) (citing Smith v. Vaughn, 174 Ohio App.3d 473, 882 N.E.2d 941 (Ohio Ct.App.2007)). From the evidence before the court, there is no indication that the government acted in an inequitable manner. At the time that the government filed the NFTLs, there was no reason to anticipate that the government would benefit by moving ahead of the existing mortgage lien. "Through no fault of its own, it became first lienholder." Home Sales, 2011 WL 2623673, at *3.

The government argues that Wells Fargo cannot be subrogated to its own prior mortgage. (Doc. 55, at 19; doc. 48, at 18–20.) Not only the statutory language, but the cases and black-letter law support that proposition. The government quotes, for example, the Restatement on mortgages: "Obviously subrogation cannot be involved unless the second loan is made by a different lender [than] the holder of the first mortgage; one cannot be subrogated to one's own previous mortgage." (Doc. 48, at 19, quoting Restatement (Third) of Property (Mortgages) § 7.6 cmt. e (1997).)

The concept of subrogation involving "another" is basic. The Supreme Court of Ohio has defined "subrogation" as "the substitution of one person in the place of another with reference to a lawful claim or right." Federal Union Life Ins. Co. v. Deitsch, 127 Ohio St. 505, 510, 189 N.E. 440, 442 (1934); see also Maryland Cas. Co. v. Gough, 146 Ohio St. 305, 315, 65 N.E.2d 858, 864 (1946) (subrogation allowed only in favor of one who has been obliged to pay debt of another, not one who pays debt in performance of own obligation).

The Sixth Circuit has stated:

The requirements of equitable subrogation were long ago stated by the U.S. Supreme Court. Firstly, the party seeking equitable subrogation "must have paid a debt due to a third party before he can be substituted to that party's rights."

*Federal Ins. Co. v. Hartford Steam Boiler Inspection and Ins. Co.*, 415 F.3d 487, 494 (6th Cir.2005) (quoting *Prairie State Bank v. United States*, 164 U.S. 227, 231, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896)); see also *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 281 (6th Cir.1997) (substitution of one person in place of another with reference to lawful claim or right). Similarly, in the Fifth Circuit, we find:

> Subrogation requires (1) the party to have paid a debt to a third party on behalf of the other party and (2) that he must have been compelled to do so; such as by a surety agreement. *Prairie State Nat. Bank v. United States*, 164 U.S. 227, 231, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896); see also [*St. Paul Property and Liability Ins. Co. v.*] *Nance*, 577 So.2d [1238] at 1240–41 [ (1991) ] (noting that "[s]ubrogation is the substitution of one person in place of another, whether as a creditor or as the possessor of any rightful claim").

*Lyndon Property Ins. Co. v. Duke Levy and Assoc., LLC*, 475 F.3d 268, 271 (5th Cir.2007).

Wells Fargo points to two cases which it argues support its view that it may be subrogated to its own prior mortgage. (Doc. 49, at 18.) In the first case, which Wells Fargo cites without discussion, the First Circuit applied Massachusetts law on unjust enrichment to reinstate a mortgagor to first lien position after a refinancing, overturning a district court ruling to the contrary. *Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228 (1st Cir.1996). Although the court recognized that six federal tax liens on the property had been recorded in between the two mortgages, the court noted, without citing any evidence in support, that the mortgagor "was presumably unaware of the existing tax liens." *Progressive Consumers*, 79 F.3d at 1230. The court found that, under Massachusetts law, the doctrine of unjust enrichment provides "where a mortgage has been discharged by mistake,[9] equity will set the discharge aside and reinstate the mortgage to the position which the parties intended it to occupy, if the rights of the intervening lienholders have not been affected." *Progressive Consumers*, 79 F.3d at 1236 (quoting *North Easton Co-op. Bank v. MacLean*, 300 Mass. 285, 15 N.E.2d 241, 245 (1938)). Whatever the wisdom of this approach, which casts a party's negligence as a "mistake," it is not persuasive here, where Ohio law leads to a contrary result.

The government contends that equitable subrogation is not appropriate under the circumstances of this case, "where a mortgagee negligently released its mortgage despite having intervening federal tax liens of record." (Doc. 55, at 19.) The state supreme court has found that negligence alone is enough to defeat equitable subrogation.[10] *ABN*, 126 Ohio St.3d at 428, 934

---

**9.** Because the parties intentionally refinanced the mortgage (for a larger principal sum), it is unclear on what basis the court characterized the recording of the second mortgage, which discharged the earlier mortgage, as an "inadvertent discharge" of the first mortgage. *See Progressive Consumers*, 79 F.3d at 1236, 1237.

**10.** The court in *ABN* noted that whether it was the bank or the title insurance company which was negligent was uncertain, but if the title insurance company was negligent, the bank "may have a claim against it for its loss, negating its need for equitable subrogation."

N.E.2d at 927 (citing *Jones,* 61 Ohio St.2d at 103, 399 N.E.2d 1215); see also *Washington Mut. Bank v. Chiappetta,* No. 1:07CV683, 2011 WL 9150876, at *9 (N.D.Ohio Nov. 8, 2011) (quoting *ABN*); *In re Simms,* 300 B.R. 877, 880 (Bankr. S.D.W.Va.2003) (applying Ohio law) (simple title search would have disclosed existence of liens); *Old Republic Nat'l Title Ins. Co. v. Fifth Third Bank,* No. 070567, 2008 WL 1914297, at *2 (Ohio Ct.App. May 2, 2008); *Huntington Nat'l Bank v. Allgier,* No. WD–07–061, 2008 WL 746984, at *2 (Ohio Ct.App. Mar. 21, 2008).

The defendant State of Ohio, Department of Taxation, also weighs in on this issue, arguing as well that Wells Fargo's negligence should not entitle it to equitable subrogation. (Doc. 51, at 4–5.) The State cites *Leppo, Inc. v. Kiefer,* where the court found that it was inappropriate to apply equitable subrogation where the party seeking subrogation was negligent. *Leppo, Inc. v. Kiefer,* No. 20097, 2001 WL 81262, at *2 (Ohio Ct.App. Jan. 31, 2001). The court also found that "equitable subrogation is not appropriate where the party seeking its application was in the best position to protect its own interest." *Id.* The court pointed out that the liens at issue were matters of public record, in which case constructive knowledge of the encumbrance is presumed. *Leppo,* 2001 WL 81262, at *4 (citing *Tiller v. Hinton,* 19 Ohio St.3d 66, 482 N.E.2d 946 (1985)).

In the second case cited by *Wells Fargo, Van Dyk Mortg. Corp. v. United States,* the court denied a motion to dismiss a claim for equitable subrogation involving a federal tax lien. *Van Dyk Mortg. Corp. v. United States,* 503 F.Supp.2d 876 (W.D.Mich.2007). The factual circumstances distinguish that case from the case at bar, and the court does not find it to be persuasive authority supporting Wells

*ABN,* 126 Ohio St.3d at 428, 934 N.E.2d at 927.

Fargo's arguments. In Van Dyk, the parties entered into, and executed, a second mortgage which discharged the original mortgage on the same property between the same parties. However, five days after the second mortgage was executed, but before it had been recorded, the IRS recorded two NFTLs against the property. *Van Dyk,* 503 F.Supp.2d at 877.

The mortgage company in Van Dyk alleged that it had no actual or constructive knowledge of the IRS's interest in the property at the time the second mortgage was executed. *Van Dyk,* 503 F.Supp.2d at 878. The court recognized that, as between a state law lien and a federal tax lien, the first perfected lien is entitled to priority. *Id.* at 879. However, discussing the application of equitable subrogation under Michigan law, the court noted:

> ... Van Dyk did not have actual or constructive notice of the tax lien at the time it made the 2004 [second] loan, nor could it have been aware of the lien through notice, because it was not recorded until several days after the [mortgagees] executed the new mortgage.

*Van Dyk,* 503 F.Supp.2d at 886. Here, in contrast, the IRS had recorded an NFTL specifically attaching the East Heisley Property on Feb. 8, 2005, almost five years before the mortgage was signed by Long and Puruczky on Nov. 23, 2009 (and recorded on Dec. 9, 2009). (Doc. 48, PX 34, 46.)

The court finds that Wells Fargo has not met its burden of showing "the absence of a genuine issue of material fact," nor that it is entitled to a judgment as a matter of law, as to its argument that equitable subrogation should be applied in its favor.

Wells Fargo's motion for summary judgment is denied.

## VI. UNITED STATES' MOTION FOR SUMMARY JUDGMENT

The plaintiff United States moves for summary judgment on several claims:

(1) that defendant Gerald C. Long is liable to the United States for federal income taxes, penalties, and interest for the years 2002 and 2004 in the amount of $100,336.23 as of August 5, 2013, plus statutory additions from and after that date until fully paid;

(2) that federal tax liens associated with the 2002 and 2004 income tax liabilities of Gerald C. Long have attached and remain attached to the real property located at 5435 East Heisley Road, Mentor, Ohio 44060 ("the East Heisley Property"), record title to which is currently held in the name of Eleanor L. Puruczky, Mr. Long's fraudulent transferee and/or nominee; and,

(3) that the federal tax liens shall be enforced through a judicial sale of the East Heisley Property, which shall be sold free and clear of all rights, titles, claims, liens, and interests of the parties to this action, with 50% of the net proceeds (after payment of the costs of sale and any real property taxes entitled to priority pursuant to 26 U.S.C. § 6323(b)(6)) to be paid to the United States for application toward Gerald C. Long's 2002 and 2004 income tax liabilities, and with the remaining proceeds to be distributed to the other parties in accordance with their lawful priorities. (Doc. 48, at 1.)

### A. Long's Tax Liabilities

As discussed earlier, this claim is unopposed. See generally doc. 53; doc. 54; doc. 55, brief in support, at 1. Therefore, the motion for summary judgment is GRANTED as to this claim, and the court finds that defendant Gerald C. Long is liable to the United States for federal income taxes, penalties, and interest for the years 2002 and 2004 in the amount of $100,336.23, as of August 5, 2013, plus statutory additions from and after that date until fully paid.

### B. Fraudulent Conveyance

The government asserts that Long's November 2000 transfer of his 50% record title interest in the East Heisley Property to Puruczky was a fraudulent transfer under Ohio law, and should be set aside. (Doc. 48, at 12–14.) The United States, as plaintiff, has the burden to establish this claim by presenting evidence that would entitle the government to a directed verdict if that evidence were not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115; see also *Saab Cars*, 434 F.3d at 1368–1369; *Fontenot*, 780 F.2d at 1194.

The government has the burden of proving fraudulent intent by clear and convincing evidence. *Blood*, 162 Ohio App.3d at 557–558, 834 N.E.2d at 367–368; see also *Stein v. Brown*, 18 Ohio St.3d 305, 308, 480 N.E.2d 1121, 1124 (1985). The government recognizes that a proof of a fraudulent transfer requires "actual intent to hinder, delay, or defraud any creditor," regardless of whether the creditor's claim arose before or after the transfer. (Doc. 48, at 12, quoting Ohio Rev.Code § 1336.04(A)(1).) "Actual intent may be present whether the transfer was motivated entirely or merely in part by a desire to hinder, delay or defraud creditors." (Doc. 48, at 12, quoting *In re Stanley*, 384 B.R. 788, 799 (S.D.Ohio Bankr.2008).)

As mentioned earlier, "Ohio has recognized that proof of actual intent will often be impossible to procure. Thus, direct evidence of fraudulent intent is not essential. A creditor may still establish a debt-

or's actual fraudulent intent if the circumstances demonstrate 'badges of fraud.' " *Blood,* 162 Ohio App.3d at 557–558, 834 N.E.2d at 367–368.

Whether fraudulent intent exists is to be determined based upon the facts and circumstances of each case. *Blood,* 162 Ohio App.3d at 559, 834 N.E.2d at 368; see also *Stein,* 18 Ohio St.3d at 308, 480 N.E.2d at 1124. While the existence of one or more badges of fraud does not constitute fraud per se, the government is not required to demonstrate the presence of all of the badges. *Blood,* 162 Ohio App.3d at 559, 834 N.E.2d at 368.

The parties agree that the analysis is governed by the badges of fraud set out in Ohio Rev.Code § 1336.04(B). (Doc. 48, at 12–13.) The government presents the following as relevant:

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

* * *

(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the assets of the debtor;

* *

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(Doc. 48, at 12–13, quoting Ohio Rev.Code § 1336.04(B).) The government contends that all six of the above-mentioned badges of fraud are present in this case. (Doc. 48, at 13.)

### 1. Possession or Control

The government points out that Long retained possession or control of the East Heisley Property long after the transfer by continuing to reside there rent-free, to pay the mortgage and other bills, to enjoy unfettered use of the property, and to hold himself out as a co-owner with Puruczky. (Doc. 48, at 13.) Wells Fargo responds that Long's continued residence "is of no significance given that he and Ms. Puruczky have been dating for nearly fifteen years under circumstances where they have consistently split costs associated with the Property." (Doc. 53, at 2, citing *United States v. Porath,* 764 F.Supp.2d 883 (E.D.Mich.2011), aff'd, 490 Fed.Appx. 789 (6th Cir.2012).)

The government counters that Long and Puruczky had only been together one year at the time of the transfer, and that the portion of Porath quoted by Wells Fargo ("one would expect such living arrangements between spouses") concerned an allegation of nominee status, not one of the badges of fraud for fraudulent transfer. (Doc. 58, at 3; see *Porath,* 764 F.Supp.2d at 903.) Under a nominee theory, this court has already commented above that, given their status as an unmarried couple, it would be difficult for the court to determine whether they have "the type of relationship where both individuals [would or] would not normally be expected to simultaneously act as true owners," regardless of how title was held. *Spotts,* 429 F.3d at 253 n. 2. This uncertainty arises as well as to the relevant badge of fraud, and creates a material issue of fact.

### 2. Sued or Threatened with Suit; Substantial Debt

Wells Fargo denies two of the government's allegations of badges of fraud (con-

cerning Sect. 1336.04(B)(4),(10)) together (doc. 53, at 2–3), they will be addressed together here. The government points out that Long was threatened with suit prior to the transfer, as evidenced by the fact that he was charged with federal tax crimes less than three months after the transfer, and his plea agreement shows that he knew his tax returns were false at the time he filed them. (Doc. 48, at 13, citing doc. 48, at 3–4, ¶¶ 14, 16, 17; doc. 58, at 5.) The government also alleges that the transfer occurred shortly before a substantial debt was incurred, namely, the significant tax liabilities in his May 18, 2001, plea agreement. (Doc. 48, at 14.)

 Although Wells Fargo argues that the suit referenced by the government concerned unpaid taxes for earlier years, and that the liens sought to be enforced here concerned later tax years (doc. 53, at 2–3), the statutory language is whether the debtor "had been sued or threatened with suit." Ohio Rev.Code § 1336.04(B)(4). A transfer may be found fraudulent under the statute whether the claim of the creditor arose before or after the transfer was made. *Carter–Jones Lumber Co. v. JCA Rentals, L.L.C.,* No. 12MA56, 2013 WL 942299, at *4 (Ohio Ct.App. Mar. 8, 2013) (quoting Ohio Rev.Code § 1336.04(A)); *Wells Fargo Fin. Leasing, Inc. v. Trio Transp., Inc.,* No. 04JE33, 2005 WL 2172852, at *5 (Ohio Ct.App. Aug. 30, 2005).

Wells Fargo does not specifically address the "substantial debt" factor, beyond summarily denying it. See generally doc. 53, at 2.

### 3. Whether Transfer was Substantially All of Long's Assets; Issue of Consideration; Insolvency

Because Wells Fargo responds to three of the government's allegations of badges of fraud (concerning Sect. 1336.04(B)(5),

(8), (9)) together (doc. 53, at 3–6), they will be addressed together here.

The government argues that, as evidenced by Long's 2005 Collection Information Statement, the transfer of the East Heisley Property, along with the transfer of the Village Green Condominium, was of substantially all of his assets, "leaving nothing of any substantial value in his name." (Doc. 48, at 13.) The government also contends that the consideration that Long received from Puruczky "was not reasonably equivalent to the value of his 50% interest." *Id.* It is also claimed that Long was either insolvent at the time of the transfer, or become insolvent shortly thereafter. *Id.* at 14.

Wells Fargo responds that the plaintiff has submitted no evidence to support these badges. (Doc. 53, at 3.) Wells Fargo does not address any further the government's argument that the transfer(s) were of substantially all Long's assets. See generally doc. 53, at 3–6.

As to the allegation that Long was insolvent at the time of the transfer, Wells Fargo contends that the government has not submitted any evidence to support its position that Long was insolvent in November 2000, when the Quit–Claim deed was executed. (Doc. 53, at 5 n. 19.) The government responds that a debtor is insolvent if the sum of his debts is greater than all of his assets. (Doc. 58, at 10.) The government argues that, because Long has not paid his tax liabilities, as required by the plea agreement, he should be considered insolvent. *Id.* at 10–11.

Wells Fargo does address the issue of consideration. (Doc. 53, at 3–6.) In its motion, the government argues that the consideration that Long received from Puruczky was not reasonably equivalent to the value of his 50% interest. (Doc. 48, at 13.) The government disputes Long and Puruczky's claim that Puruczky provided

most of the funds for the original purchase of the East Heisley Property: "... they jointly made the $5,000 deposit, jointly established a line of credit against the Jeannette Property that they used for the down payment, and jointly granted the 2000 Mortgage." (Doc. 48, at 13–14, citing doc. 48, at 1–3, ¶¶ 2, 8, 10–13.)

Wells Fargo responds that Puruczky owned that Jeannette Property free and clear, that Long had no interest in that property, and that any equity in the Jeannette Property was Puruczky's alone. (Doc. 53, at 3–5.) Wells Fargo argues that Puruczky used that equity toward a down payment for the East Heisley Property. *Id.* at 4–5. Wells Fargo recognizes, in addition, that Long and Puruczky jointly paid a portion of the $5,000 deposit, and were jointly liable on the $153,000 promissory note and mortgage securing the property. *Id.* at 5.

However, Wells Fargo contends that it is incorrect to argue that because the property was purchased for $253,000, therefore Long's interest was worth half of that amount, "such that his conveyance for no consideration was fraudulent." (Doc. 53, at 5.) In defendant's view, the "reality" is that Long's interest was "effectively worthless," because he had, at best, "a couple of thousand dollars" in equity in the East Heisley Property when he executed the quit-claim deed. *Id.* Thus, Wells Fargo claims that there was no reason for Puruczky to pay any consideration to Long, when he had less than $5,000 equity in the property. *Id.* at 6.

In this court's view, neither party is utilizing the correct analysis. The complaint alleges Long transferred his record interest in the East Heisley Property to Puruczky through a fraudulent convey-ance. (Doc. 1, Compl., at ¶¶ 20–22.) The complaint identifies the transfer at issue as the quit-claim deed of Nov. 3, 2000. (Doc. 1, Compl., at ¶¶ 9, 20–22.) The grantor conveys through a quit-claim deed whatever rights he has at the time of the conveyance. See, e.g., *Jonke v. Rubin,* 170 Ohio St. 41, 41, 162 N.E.2d 116, 116 (1959) (syllabus).

The warranty deed of Oct. 6, 2000, listed both Long and Puruczky[11] as the grantees of the conveyance of the East Heisley Property. (Doc. 48, PX 5.) The deed granting the property to Long and Puruczky named them both as grantees, but was silent as to their respective ownership interests. In such a case, under Ohio law "a rebuttable presumption exists that the grantees took equal interests in the property." *Bryan v. Looker,* 94 Ohio App.3d 228, 231, 640 N.E.2d 590, 592–593 (Ohio Ct.App.1994) (citing cases); see also *Huls v. Huls,* 98 Ohio App. 509, 510–511, 130 N.E.2d 412, 413 (Ohio Ct.App.1954) (where deed silent as to respective shares of grantees, law presumes shares are equal). Thus, by the warranty deed, Long had a 50% interest in the East Heisley Property. Neither party has presented any evidence that the purchase price of the East Heisley Property should not be deemed to be the fair value of the property. Through the quit-claim deed, then, Long conveyed his 50% interest in the East Heisley Property to Puruczky, which property had been valued at $253,450 the previous month. See doc. 48, PX 1 (Purchase Agreement).

Wells Fargo appears to be arguing that Puruczky had a much larger "equitable interest" in the property, because of how the initial purchase was financed. Howev-

---

11. Long and Puruczky each admitted that they were co-grantees on the deed because they were to become co-borrowers on the 2000 mortgage. (Doc. 48, PX 6, Admission No. 1; doc. 48, PX 7, Admission No. 1.)

er, Wells Fargo presents no case authority which would direct the court to consider, or make a determination of, the equitable interests in the property in the circumstances of the case (enforcement of federal tax liens), as opposed to, for example, an action for partition under Ohio Rev.Code §§ 5307.01, 5307.04. Under Ohio law, the court presumes that Long and Puruczky had equal interests in the East Heisley Property via the warranty deed. *Bryan*, 94 Ohio App.3d at 231, 640 N.E.2d at 592–593; see also *Huls*, 98 Ohio App. at 510–511, 130 N.E.2d at 413.

The value of the consideration received by Long was not reasonably equivalent to the value of the asset transferred. Long conveyed his interest in the East Heisley Property (approximately $126,725, less any existing encumbrances) to Puruczky for no consideration.[12] In addition, there is no evidence that Long does not remain jointly liable (with Puruczky) for the remaining balance of the $153,450 mortgage on the East Heisley Property. See doc. 48, PX 10; see also PX 8–9.

As part of the overall facts and circumstances, Puruczky avers that the couple proceeded as they did concerning the financing and related matters because she was unable to obtain financing on her own. (Doc. 49, DX A, Puruczky aff., ¶¶ 14–16, 19–20.) Puruczky also avers that it was her intention that title to the East Heisley Property would be solely in her name. (Doc. 49, DX A, Puruczky aff., ¶ 23.) These averments create issues of credibility, which are not to be resolved on summary judgment. See, e.g., *Ahlers*, 188 F.3d at 369 (credibility judgments prohibited on summary judgment); see also

Seamons, 206 F.3d at 1027–1028 (question of intent).

The government has the burden of proving fraudulent intent by clear and convincing evidence. *Blood*, 162 Ohio App.3d at 557–558, 834 N.E.2d at 367–368; see also *Stein*, 18 Ohio St.3d at 308, 480 N.E.2d at 1124. Whether fraudulent intent exists is to be determined based upon the facts and circumstances of each case. *Blood*, 162 Ohio App.3d at 559, 834 N.E.2d at 368; see also *Stein*, 18 Ohio St.3d at 308, 480 N.E.2d at 1124. Although the government has shown evidentiary support for certain elements of its allegations of fraudulent conveyance, the court finds that the government has not met its burden of presenting sufficient evidence that would entitle the government to a directed verdict if that evidence were not controverted at trial. The motion for summary judgment is denied, as to this issue.

### C. *Puruczky's Nominee Status*

The government also argues that Puruczky holds title to the East Heisley Property as Long's nominee. (Doc. 48, at 15–16.) The parties' arguments on this issue are similar to their arguments on the nominee issue as raised in Wells Fargo's motion for summary judgment. See generally doc. 48, at 15–16; doc. 53, at 6–8.

The United States, as plaintiff, has the burden to establish Puruczky's status as a nominee for Long's ownership interest in the East Heisley Property by presenting evidence that would entitle the government to a directed verdict if that evidence were not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115; see also *Saab Cars*, 434 F.3d at 1368–1369; *Fontenot*, 780 F.2d at 1194. The court has deter-

---

**12.** Wells Fargo argues that "there was no reason for Eleanor Puruczky to pay any consideration to Defendant Long for his 1/2 interest when he had less than $5,000 equity" in the property. (Doc. 53, at 6.) Thus, the court does not address the "past consideration" theory, not raised by Wells Fargo here, that the government refutes in its Reply. *See generally* doc. 58, at 6–8.

mined, based on the evidence presented by the parties, and discussed fully earlier, that there is a genuine issue of material fact regarding Puruczky's status as a nominee for Long's ownership interest in the East Heisley Property. The government's motion for summary judgment is denied, as to this issue.

### D. Enforcement of Federal Tax Liens

The United States moves for enforcement of the federal tax liens against Long through a judicial sale of the East Heisley Property. (Doc. 48, at 16–18.) The court notes that, naturally, enforcement against the East Heisley Property will be dependent on a finding either that the November 2000 deed was a fraudulent conveyance, or that Puruczky holds title in the East Heisley Property as Long's nominee. The court does not find either to be established at this juncture. Nonetheless, the court will proceed to determine the priority of the liens should enforcement subsequently be authorized.

 When federal tax liens are at issue, "the relative priority of competing liens is a matter of federal law." *Mortgage Elec. Registration Sys., Inc. v. Church*, 423 Fed.Appx. 564, 564–65 (6th Cir.2011) (citing *Craft*, 535 U.S. at 274, 122 S.Ct. 1414).

The priority of a federal tax lien under 26 U.S.C. § 6321 as against liens created under state law is governed by the common law rule, "first in time, first in right." *Pioneer American*, 374 U.S. at 87, 83 S.Ct. 1651 (citing *City of New Britain*, 347 U.S. at 85–86, 74 S.Ct. 367); *MERS*, 423 Fed. Appx. at 564–65; *Wayne Cnty. Bd. of Cnty. Comm'rs v. Mendel, Inc.*, 22 Fed. Appx. 488, 491 (6th Cir.2001). Ordinarily, under 26 U.S.C. § 6322, a federal tax lien is perfected at the time the lien is assessed. *Wayne County*, 22 Fed.Appx. at 491 (citing *In re Terwilliger's Catering*

*Plus, Inc.*, 911 F.2d 1168, 1176 (6th Cir. 1990)).

An exception to the "first in time" rule applies under 26 U.S.C. § 6323(a) when a federal lien competes with the interest of a purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor. *American Scrap Tire*, 2008 WL 1696927, at *5. When a competing lien falls into one of these limited categories, a federal tax lien is perfected at the time the government provides notice complying with the provisions of 26 U.S.C. § 6323(f). *American Scrap Tire*, 2008 WL 1696927, at *5; *Wayne County*, 22 Fed.Appx. at 491; see generally Ohio Rev.Code § 317.09.

The federal tax lien for the tax year 2002 was assessed on June 9, 2003. (Doc. 48, PX 28–29.) The IRS recorded a NFTL regarding Long's 2002 income tax liabilities with the Recorder of Lake County on Dec. 26, 2003. (Doc. 48, PX 31–32.) The IRS filed an NFTL concerning Long's 2002 tax liabilities, naming Puruczky as his nominee, transferee, fraudulent conveyee, or alter ego, specifically attaching the East Heisley Property, on Feb. 8, 2005. (Doc. 48, PX 34–35.)

The federal tax lien for the tax year 2004 was assessed on Aug. 25, 2005. (Doc. 48, PX 28–29.) On Nov. 8, 2005, the IRS recorded an NFTL regarding Long's 2004 income tax liabilities. (Doc. 48, PX 39.)

As to Wells Fargo, the federal tax liens were perfected at the time the government recorded that NFTLs. 26 U.S.C. § 6323(f); Ohio Rev.Code § 317.09. Both liens would take priority over the 2009 mortgage.

Wells Fargo argues that, even if the NFTLs attached to a half-interest in the East Heisley Property, Wells Fargo is entitled to first lien position under the doctrine of equitable subrogation. (Doc. 53,

at 8–12; see also doc. 49, at 14–20.) The government contends that Wells Fargo cannot be subrogated to its own previous mortgage. (Doc. 58, at 16–20.) The arguments of the parties were presented in substantially the same manner in the context of Wells Fargo's motion. The court is not persuaded that Wells Fargo is entitled to first lien position under the doctrine of equitable subrogation. See generally *Federal Union Life*, 127 Ohio St. at 510, 189 N.E. at 442 (substitution of one person in place of another); see also *Federal Insurance*, 415 F.3d at 494 (quoting *Prairie State Bank*, 164 U.S. at 231); *Morris*, 105 F.3d at 281; *Chiappetta*, 2011 WL 9150876, at *9 (negligence defeats equitable subrogation, quoting ABN); *Maryland Casualty*, 146 Ohio St. at 315, 65 N.E.2d at 864 (1946); *ABN*, 126 Ohio St.3d at 428, 934 N.E.2d at 927 (citing *Jones*, 61 Ohio St.2d at 103, 399 N.E.2d 1215) (negligence defeats equitable subrogation); *Leppo*, 2001 WL 81262, at *2 (same).

In its amended answer, Wells Fargo asserted that it is "entitled to first lien position on the subject property pursuant to the doctrines of equitable subrogation and/or equitable restoration." (Doc. 42, at 2.) The government asserts that the tax code does not allow for equitable restoration. (Doc. 48, at 20.) In its opposition to the government's motion, Wells Fargo does not pursue this theory. See generally doc. 53, at 8–12.

The State of Ohio, Department of Taxation, also asserts liens against the East Heisley Property based on notices filed against Long on Apr. 19, 2005, and Oct. 11, 2005. (Doc. 15.) Although the State opposed Wells Fargo's motion (doc. 51), it has not filed an opposition to the United States' motion. The government asserts that priority between federal tax liens and Ohio tax liens is determined by comparing the dates of the federal tax assessments (rather than the recording dates) with the state lien filing dates. (Doc. 48, at 17, citing *Reed v. Civiello*, 297 F.Supp.2d 1008, 1018 (N.D.Ohio 2003)).

The government's recitation of the priority of the Ohio state liens is supported by the evidence in the record. See generally doc. 48, at 17–18. The federal tax lien for the tax year 2002 was assessed on June 9, 2003. The federal tax lien for the tax year 2004 was assessed on Aug. 25, 2005. (Doc. 48, PX 28–29.) The Ohio tax lien of April 19, 2005 (doc. 15, at 3) thus is junior to that 2002 year federal tax lien, but senior to the 2004 tax year federal tax lien. The Ohio tax lien of Oct. 11, 2005 (doc. 15, at 3) is junior to both federal tax liens.

■ The federal tax liens have priority over other, later-filed liens and encumbrances, such as, Huntington National Bank's interest in the East Heisley Property based on a judgment obtained against Long in 2007 (doc. 13); Capital One Bank's interest in the East Heisley Property based on a judgment obtained against Long in 2009 (doc. 11); and, Wells Fargo's interest in the East Heisley Property based on the 2009 first mortgage lien (doc. 42).

## VII. SUMMARY

Defendants Long and Puruczky's motions to incorporate (doc. 50, 54) are GRANTED.

Defendant Wells Fargo's motion for summary judgment (doc. 49) is DENIED. The court finds that Wells Fargo has not met its burden of showing the absence of a genuine issue of material fact, nor that it is entitled to a judgment as a matter of law, as to the plaintiff's claims. Likewise, Defendants Long and Puruczky's motion for summary judgment (doc. 50), via incorporation of Wells Fargo's motion, is DENIED.

The plaintiff United States' motion for summary judgment (doc. 48) is GRANTED in part, and DENIED in part. The court finds that defendant Gerald C. Long is liable to the United States for federal income taxes, penalties, and interest for the tax years 2002 and 2004 in the amount of $100,336.23, as of August 5, 2013, plus statutory additions from and after that date until fully paid, thus the motion is GRANTED as to that claim. The motion is GRANTED in part, as to the priority of the federal tax liens versus other liens and encumbrances, as set forth above. As to the other claims, the motion is DENIED. The court finds that the government has not met its burden of presenting sufficient evidence that would entitle the government to a directed verdict if that evidence were not controverted at trial.

IT IS SO ORDERED.